ROSE McGARRIGLE ET AL. vs. JOHN W. GREEN.

Third Judicial District, Bridgeport, October Term, 1903.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The plaintiffs, who occupied a hat factory under a lease with an option of purchase, agreed with the defendant—who also owned and operated one or more factories for making hats—"to manufacture hats" for him for two years, furnishing tools, machinery, equipment and labor "necessary to the manufacture of hats of the

character, style and quality which" he "may desire to be manu-
factured for him." These were the only provisions of the contract
which had any reference to the quantity of hats which the plain-
tiffs were to make. *Held* that whatever might have been the in-
tention of the parties at the time the agreement was drawn, the
contract itself did not, either in express terms or by necessary im-
plication, bind the defendant to furnish the plaintiffs with any or-
ders at all; and much less to supply them with orders to the detri-
ment or destruction of his own business.

Argued November 10th, 1903—decided January 6th, 1904.

ACTION to recover damages for breach of contract, brought
to the Superior Court in Fairfield County and tried to the
jury before *Ralph Wheeler, J. ;* verdict and judgment for the
plaintiffs for $1,005 damages, and appeal by the defendant.
*Error and new trial granted.*

*Samuel Tweedy* and *Howard B. Scott,* for the appellant
(defendant).

*Howard W. Taylor,* for the appellees (plaintiffs).

TORRANCE, C. J.   This is an action to recover damages
for the breach of a written contract made by the plaintiffs
and the defendant at Danbury in this State, dated the 14th
day of July, 1899, and called herein contract *B.*   The plain-
tiffs, at the beginning of the suit, were Rose McGarrigle
and Daniel Keating.   During the pendency of the suit Mrs.
McGarrigle died, and the suit is now prosecuted by her ad-
ministrator and Keating.

The disposition of the case depends largely upon the con-
struction that may be put upon contract *B ;* and as that con-
tract is to be construed in the light of the circumstances in
which it was made, if necessary, it will be well here and now
to state briefly what those circumstances were, as they ap-
pear of record.   When the contract was made the defend-
ant, Green, was, and theretofore had been, and thereafter
continued to be, extensively engaged in the manufacture of
hats in Danbury.   He owned one large hat factory, was
part owner in another, had charge of the former, and had
part charge of the latter.   Such was his situation.

When the contract was made, the plaintiffs were in the possession of a hat factory in Danbury, with all the machinery and tools therein, known as the " Johnson factory." They held possession of that factory by virtue of a written agreement with Dexter, the owner thereof, made and dated on the 13th day of July, 1899, called herein contract *A.* Under that contract the plaintiffs had the right to occupy said factory, and to use all the tools and machinery therein, free of rent, and the right ultimately to purchase the same at an agreed price, upon keeping and performing all the conditions and stipulations on their part to be kept and performed, contained in contract *A.* For some time prior to July 14th, 1899, the plaintiffs, at said Johnson factory, had made hats for a commission house in New York City, out of materials furnished by said house, and had also sold to said house hats manufactured by the plaintiffs out of their own materials. Such was the situation of the parties of the second part in contract *B,* when that contract was executed.

The material parts of contract *B* are the following: The plaintiffs agree with Green " to manufacture hats " for him, " for the term of two (2) years from and after July 14th, 1899, upon the following terms and conditions, to wit: " Keating and McGarrigle " shall provide at all times the factory occupied by them and known as the ' Johnson factory ' (or other equally convenient factory), together with tools, machinery, fixtures, equipment and labor necessary to the manufacture of hats of the character, style and quality which " Green " may desire to be manufactured for him." Keating and McGarrigle " shall give their entire time and attention to the manufacture of such hats under the direction of " Green, " and during the life of this agreement " they " shall not engage in the manufacture of hats, either for themselves or for any person or persons other than " Green, without his consent. Green " agrees to provide all stock and material necessary to the manufacture of said hats, which stock and material shall at all times remain his property, and to advance to " Keating and McGarrigle " all

moneys that may be necessary to pay for labor employed and fuel and water purchased" by them in the manufacture of the hats; "and as a part of such labor it is agreed that" Keating and McGarrigle "shall draw twenty-five ($25) dollars each per week." The contract then provides for the selection and employment of a bookkeeper to keep the accounts relating to business done under the contract, and that the accounts shall at all times be open to the inspection of Green. It also provides that Green "shall take sole charge of the sale and disposition of all hats manufactured for him by" Keating and McGarrigle under the agreement. It further provides, in substance, as follows: "As compensation for the manufacture of such hats," Keating and McGarrigle "shall receive one half (1/2) of all net profits realized by" Green "from the manufacture and sale of such hats." In estimating such net profits, it is agreed that certain specified items shall be deducted from the amounts received by Green from the sale of hats made under contract *B*. Green agrees to advance to Keating and McGarrigle, upon certain prescribed conditions, certain sums of money from time to time, to enable them to meet certain payments called for from them under contract *A*; which advancements were to be deducted from the profits due to them under the contract. "In the event that the manufacture of hats under this agreement should not be conducted at a profit sufficient, in the opinion of" Green, "to warrant the continuance of such business," then Green "may terminate this agreement at any time after January 1st, 1900." The profits are to be divided and paid over "at the termination of each hatting trade." "It is expressly understood and agreed that in the manufacture of hats under this agreement," the parties to it "are not partners, and that the moneys paid" to Keating and McGarrigle by Green "from the sale of said hats, is paid to the said parties . . . as compensation for services and use of said factory."

Such was the contract entered into by the parties. Under it the parties, in July, 1899, began the manufacture and sale of hats according to its terms, and so continued until on or

about September 21st, of the same year, when, as the evidence for the plaintiffs tended to show, the defendant refused to go on with his part of the agreement, and ceased to furnish material for the making of hats at said Johnson factory, and refused to make any further advancements of money under said contract, and refused to do anything more thereunder. Upon these facts the plaintiffs claimed the right to recover their share of the profits of the business up to the time of said breach of the contract, and also the damages caused to them by said breach.

The defendant asked the court to charge the jury, (1) that the defendant was not obliged by the contract to keep the plaintiffs' factory supplied with orders to its full capacity; and (2) that he was not obliged to furnish the plaintiffs with any orders. The court did not so charge, but instead thereof charged that "it became the duty of the defendant, with ordinary diligence, care and prudence of an experienced man in the hatting trade, and by the exercise or use of the ordinary means and methods for the sale and disposal of hats, to endeavor to provide the plaintiffs with employment suited to the capacity and equipment of their factory, with the view and purpose of establishing and maintaining a profitable business in connection with the plaintiffs, and to continue his endeavors therein, unless sooner discharged from his duty by reason of the failure of the plaintiffs in their duty under the contract, until the 1st day of January, 1900." In this connection the court further charged as follows: "The profitable use of the plaintiffs' factory under the contract is not to be regarded as dependent upon the overflow of the defendant's factory, but as based upon business-like methods and means to be adopted by the defendant to establish in connection with the plaintiffs a profitable business in the manufacture and sale of hats, without regard to the conditions at his own factory, except as he might have chosen to increase the business at the plaintiffs' factory by turning any overflow from his own factory in that direction."

The jury was thus told, in effect, that under contract *B*

Green was bound to do whatever was reasonably necessary to furnish the plaintiffs with orders for hats, to the extent of the capacity of their factory, and that to do this involved the closing of his own factory whenever the orders he had on hand were not more than sufficient to keep the plaintiffs so employed.

We think contract B does not bind the defendant to furnish the plaintiffs with any orders for hats at all. Under it he may do so, and if he does so, and desires the plaintiffs to fill such orders, then the defendant must furnish them with material, and make advancements to them of money, for that purpose, as the contract provides; but by the contract itself, before anything is done under it, he is not obligated to furnish the plaintiffs any orders for hats. We look in vain through the contract for any express agreement on his part to do so.

Looking at the agreements entered into by the plaintiffs in contract B, it may be conceded that they supposed the defendant was bound to furnish them with orders for hats to the extent indicated in the charge; because otherwise they probably would not have bound themselves as they did to work for no one save the defendant; indeed it may be conceded that the contract was probably drawn on the part of both parties for the purpose of binding the defendant to such agreement, and that he supposed he was so bound by it, and even that he ought to be so bound; but the question before us is not what the parties meant to bind themselves to do, nor what they supposed they had bound themselves to do, nor even what they ought to have bound themselves to do; it is simply what have they, as manifested by their written words, bound themselves to do. Did the defendant, in contract B, bind himself to furnish the plaintiffs with any orders for hats? The only express reference to this matter in the contract is this: "The parties of the second part shall provide at all times the factory occupied by them and known as the 'Johnson factory' (or other equally convenient factory), together with tools, machinery, fixtures, equipment and labor necessary to the manufacture of hats of the character, style and quality which the party of the first part may

desire to be manufactured for him." We think the last clause of this quotation governs the quantity of hats to be made under the contract, as well as the character, style and quality of such hats. The plaintiffs were to furnish factory and labor "necessary to the manufacture of hats . . . which the party of the first part may desire to be manufactured for him," as well as hats of the character, style and quality which he might so "desire to be manufactured for him." Unless the contract is so construed, it follows that nowhere in it is the quantity of hats to be made under it expressly provided for; for nowhere else in it is there any other reference to this matter. If we are to guess or infer from the entire contract that the defendant, when he executed it, actually intended to bind himself to furnish the plaintiffs with some definitely ascertainable amount of business, that will not help matters unless that intention is expressed in the contract. No such intention is found in the contract in express terms; and we think it is not to be found there by necessary implication. From the fact that the plaintiffs bound themselves, absolutely, to make hats which the defendant might order, to the extent of the capacity of their factory, it by no means necessarily follows that the defendant bound himself absolutely to furnish them with any orders for hats. If any obligation to furnish to the plaintiffs any orders for hats rests upon the defendant, it arises by way of inference and implication; and if any such obligation rests upon the defendant, it rests upon him to the extent indicated by the trial court in its charge; for no other measure of the extent of the defendant's implied obligation is given in the contract, or can in reason be inferred from it. The defendant is either bound to the extent indicated in the charge, or he is not bound at all. Now, reading this contract on the part of the defendant in the light of the circumstances in which it was made, can it be fairly said that the defendant, by the words used with reference to his obligation, meant to bind himself to cripple his own life business and perhaps destroy it, and to close his factories at any time, for the sake of two years' business in a small way with the plaintiffs? We think not. We think it

is more reasonable to hold that the plaintiffs, through the fault possibly of the scrivener who drew the contract, failed to obtain from the defendant any absolute obligation to furnish them with any orders under the contract.

In this view of the case it becomes unnecessary to discuss or consider the other questions made upon this appeal. The defendant was under no obligation to continue the business with the plaintiffs after September 21st, 1899, but the plaintiffs, under the contract, are entitled to their share of the profits, if any, accruing in the business conducted under it up to that time.

There is error and a new trial is granted.

In this opinion the other judges concurred.