### TIDE WATER BLDG. CO. v. HAMMOND et al.

(Supreme Court, Appellate Division, First Department.   May 5, 1911.)

1. CONTRACTS (§ 280*)—BUILDING CONTRACTS—REQUIREMENTS.

A building contract requiring the exterior walls to be cleaned and given a heavy coat of specified paint, and to be guaranteed to be impervious to water and dampness, did not require the contractor to do more than the specifications required to make limestone impervious.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1252; Dec. Dig. § 280.*]

2. CONTRACTS (§ 280*)—BUILDING CONTRACTS—REQUIREMENTS.

A building contractor guaranteeing a roof to be water-tight was not bound to do more than the specifications required to make it so.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1252; Dec. Dig. § 280.*]

3. CONTRACTS (§ 322*)—BUILDING CONTRACTS—CONFORMITY TO SPECIFICATIONS —EVIDENCE—WEIGHT.

Evidence *held* to show performance of a building contract according to specifications and the owner's directions relieving the contractor from responsibility for certain leaky conditions.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 322.*]

Appeal from Judgment on Report of Referee.

Action by the Tide Water Building Company against John H. Hammond and another, ancillary executors of George Crocker's estate. Judgment for plaintiff, and defendants appeal. Affirmed.

The following is the opinion of Leventritt, Referee:

This is an action brought to recover a balance claimed to be due for the erection of a country house for defendants' testator. It is admitted that, if the contract has been strictly performed, the plaintiff is entitled to the sum of $13,525.70, with interest from May 1, 1907. The defendants claim that the contract provisions as to time were not complied with, and that defects in the exterior walls, roof, and window frames occasioned large damages, for which it is sought to counterclaim. On final submission no claim is made by defendants for delay, which the uncontradicted evidence shows to have been due to the acts of owner and architect and not to those of the contractor.

Defendants claim that roof, walls, and window frames were guaranteed water-tight under separate contract provisions which have not been performed. Plaintiff maintains that it has fully complied with the plans and specifications, and that, so far as these may have been modified in the case of the window frames, the defendants' testator directed the change without its consent.

The legal principles announced in MacKnight Flintic Stone Company v. Mayor, 160 N. Y. 72, 54 N. E. 661, are applicable to the disposition of this case.

In that case the plaintiff agreed to furnish "all the materials and labor for the purpose and make water-tight" a boiler room, coal room, and cellar of a courthouse and prison in the manner and under the conditions set forth in annexed specifications, which were most precise as to all details of material and construction. There was an independent covenant that "at the entire completion of the building all of the work must be gone over by the contractor and turned over to the city by him in perfect order and guaranteed absolutely water and damp proof for five years from the date of the acceptance of the work." Any dampness or water breakage within that time was to be made good by the contractor. Water and dampness appeared in the

boiler room immediately after the plaintiff had completed his job, and the architect consequently refused the usual certificate. Evidence was given to show that every requirement of the plans and specifications as to materials furnished and work done had been literally complied with, that the work had been inspected daily on behalf of the defendant, and no objection at any time had been made as to method or materials. The specific question presented for determination was whether the plaintiff could recover without making the floor of the boiler room absolutely waterproof, although it had conformed in every respect to the plan and specifications. The court held that the plaintiff did not guarantee their sufficiency to produce the result desired, but that the reasonable construction of the covenant was that the plaintiff should furnish the materials and do the work according to the plan and specifications "and thus make the floors water-tight so far as the plan and specifications would permit." "The agreement," say the court, "is not simply to do a particular thing, but to do it in a particular way and to use specified materials, in accordance with the defendant's design, which is the sole guide. The promise is not to make water-tight, but to make water-tight by following the plan and specifications prepared by the defendant, from which the plaintiff had no right to depart, even if the departure would have produced a waterproof cellar. * * * There was no discretion as to the materials to be used or the manner in which the work should be done. The plaintiff had no alternative except to follow the plan under the direction of the defendant's officers in charge. * * * If the plan and specifications were defective, it was not the fault of the plaintiff, but of the defendant, for it caused them to be made, and it alone had the power to alter them. It relied upon its own judgment in adopting them, not upon the judgment of the plaintiff. It decided for itself out of what materials and in what manner the floor should be constructed, and not only required the plaintiff to use precisely those materials and to do the work in exactly that manner, but also inspected both as the work advanced without complaint or question as to either. * * * If there was an implied warranty of sufficiency, it was made by the party who prepared the plans and specifications, because they were its work, and, in calling for proposals to produce a specified result by following them, it may fairly be said to have warranted them adequate to produce this result. * * * Interpreting their language in the light of surrounding circumstances, we do not think the parties meant that the plaintiff was to be responsible for a bad result unless there was some default on its part in doing the work or furnishing the materials. * * *" I have quoted from the MacKnight Case at length, for on the facts as I find them according to the preponderance of the evidence, it controls the disposition of this case.

[1] (1) To take up the exterior walls first. The covenant reads: "All the exterior walls throughout the building shall be thoroughly cleaned and given a heavy coat of R. I. W. or de Hydrene Waterproof Paint and shall be guaranteed impervious to water and dampness." It is conceded by the defendants that no issue of fact is presented as to the walls. It is not claimed that they were not built in strict accordance with the specifications, and no claim is made that there is any defective work. The exterior walls were required to be partly of brick and partly of limestone. The defendants offered the testimony of two employés of the defendants' testator, that of one to the effect that in the great hall the interior of the limestone showed wet on occasion, and that of the other that in times of storm the headers of some of the windows were damp. The president of the plaintiff admitted that the water seeped through the solid stone mullions in a few instances. There is undisputed testimony—in fact it is conceded in the briefs—that limestone is porous, and not impervious to water or dampness. About two and a half years after the plaintiff claims substantially to have completed its work, it suggested by letter—concerned mainly with the window frames—as part of a plan to keep water out of the house in time of severe rainstorms, that a certain application known as "fluates" be made to the entire outside of the house. At the same time the plaintiff insisted that it had built the house as the defendants' testator required it to be done, and that it was in no way responsible for any existing condition. The fluates were applied, and it is claimed that the limestone was not wet thereafter. There is no

suggestion that the heavy coat of R. I. W. or de Hydrene waterproof paint was not applied as called for in the contract. In fact, there is no dispute that the plans and specifications as to the walls were strictly followed. It does not appear that this waterproof paint was not equally intended for the limestone as well as the brick walls, although the plaintiff contends, not without force, that the clause quoted refers only to brick walls and not to the limestone lintels and mullions. If it does not refer to them, there is no question on this branch of the case. If it does, the evidence shows that the water-proofing called for by the clause has been applied. The architect knew of no particular in which the walls had not been built according to the specifications. As late as June 1, 1908, writing to the plaintiff on the subject of substantial performance, he makes no mention of the limestone, says that that question is one for the lawyers, and adds: "I do not think that you have, in respect to the sashes, complied with the modification of the original contract and made the sashes water-tight. I have no question but what you have acted in entire good faith."

The defendants insist that the contractor agreed to accomplish a certain result, and that, even though it may have complied with plan and specifications, it is bound to perform such additional work as is necessary to accomplish the result. The doctrine of reasonable construction of contracts is to be applied to this case. The intent of the parties as deduced from the whole contract and the surrounding circumstances seems to be that, unless there was default on the plaintiff's part in doing the work or furnishing the materials specified, a strict compliance with the detailed specifications would constitute performance. I fail to see how any additional work was intended. The use of limestone was made mandatory. The many provisions with reference to it would indicate that nothing that was deemed essential to proper construction, both as to material and work, was omitted. A few of the requirements may be referred to. It was provided that all the limestone should be Indiana limestone from the Bedford quarries of a shade to be selected by the architect. The individual stones were to be of the "best stock, free from sap, mineral stains, pits, excessive mica, discolorations, or imperfections affecting their durability or appearance, and of a uniform shade of color throughout and equal to approved samples." The character of the finish of the stones was stipulated, and all samples of stones "with the specified finishes thereon" were "to be submitted to the architects for their approval, and when approved shall be the standard of comparison by which the finished work shall be judged." There are further most minute provisions as to all details of the stonework. Nothing seems omitted from the requirement to follow the drawings to the shipment, crating, and marking of the stones and to the manner of their cutting, carving, placing, and finish. It seems clear that every contingency was specifically provided for. If the application of some additional waterproof material, such as "fluates," was contemplated, it would doubtless have been included. There is the obligation to furnish a heavy coat of waterproof paint which has been lived up to. Every detail of the specifications just set out has been complied with. There was no discretion in the contractor as to any of them. He performed strictly. The owner selected the kind of limestone. That has under the evidence been established to be porous, and not impervious to water. The plan to use limestone was the owner's. The details of the use were planned by the owner. He warranted the sufficiency of the plan. A fair construction of the covenant, in the absence of the clearest language to the contrary, is that the plaintiff should use specified materials in accordance with the owner's design and to make impervious to water by following the plan and specifications. There has been no default on plaintiff's part in doing the work or furnishing the materials, and I find no clear obligation on its part to furnish something not called for by the contract.

[2] (2) Much the same argument applies to the roof. The specifications as to the roof provide: "The roof over the main hall * * * shall be covered with 16 oz. copper. Over the sheathing under all copper roofs lay a single thickness of 2 ply dry sheathing paper well lapped and tacked. Copper to be in small sheets with tinned edges locked and soldered and secured with three copper cleats to each sheet. Turn the roofing up under the cap flash-

ings and lock and solder the same together." The guaranty reads: "The contractor shall guarantee the entire work watertight for a period of five years and shall make good all damage caused by leaks due to defective or insufficient work during that period." There is substantially no issue of fact as to the use of material or the construction of the roof. It is conceded that the roof has leaked. The evidence shows a twofold cause for the leaks: First. As a result of punctures after the roof was completed. The plaintiff was clearly not responsible for these, although he has assumed to repair them under the five-year guaranty. Secondly. As a result of cracks caused by expansion and contraction of the copper. The preponderance of evidence clearly justifies a finding that this, and not a failure to comply with plan and specifications or to do a good workmanlike job, was the cause of the leaks. The only evidence permitting a contrary inference is that of the architect, who, in response to a question, "If the roof had been constructed in accordance with plan and specifications, would it in your opinion have been water-tight?" answered, "I should say it would." He gave, however, no details—nor did any other witness—showing any matter as to which there had been a departure from the contract. On cross-examination he admitted that he knew of no particular in which the roof was not constructed in accordance with the plan and specifications, that "as far as I know the specifications were complied with," and that it "looked a good job when it was finished." The pure conclusion stated by the architect in his direct therefore loses all probative force. Against this there is detailed and uncontradicted evidence on the part of the plaintiff's witnesses that every item of the specifications was strictly followed, together with expert evidence that the job was done in a workmanlike manner.

On the evidence, the cause of the leaks seems to be an inherent quality in the copper when used for a roof of the expanse and dimensions of the one under consideration. Copper when applied in larger sheets contracts and expands under the influence of temperature changes, causing a buckling up and straightening out with resultant occasional cracks. The architect testified that he has seen the result of the expansion and contraction on the roof, and has seen the plates "raise a little bit," admits that the leaking as a result of the expansion and contraction "is a well-known fact," that temperature changes control these movements in the copper, there being less where the atmospheric conditions remain uniform. He also stated: "In my opinion, if a roof like that is made tight eventually, it will become water-tight. I mean to say that the expansion and contraction will wear itself out. It will find the weak points. * * *" This testimony alone would serve to explain the form of the guaranty as to the roof. "The well-known fact" was recognized that copper would spring leaks as a result of contraction and expansion of the medium, and hence the intent of the covenant that the contractor would warrant the work as water-tight as the medium would permit, and, in addition, repair any defects for a period of five years due to defective or insufficient work. Be that as it may, the owner selected the kind and consistency of the material and the contractor had no discretion but to use it. He complied with the detailed contract provisions, and should not be held to have warranted the sufficiency of the owner's plan. The defendant claims that the evidence of two of the plaintiff's witnesses establishes that copper roofs and gutters can be made water-tight. This claim is based on isolated answers, and not on their evidence as a whole. Both these witnesses, who testified to the sufficiency of the plaintiff's work, stated that they had constructed roofs that were water-tight in the first instance. Both, however, are emphatic that cracking and leaking will occur thereafter, one claiming that a copper roof will have to be repaired continuously and the other that roofs that he had guaranteed were the subject of complaint and had to be repaired.

The whole evidence as to the roof fairly compels the finding that the leaks were the result of the inherent characteristics of the metal, and that the plaintiff fully complied with the plans and specifications, both as to material and workmanship.

[3] (3) As to the window frames there is a substantial issue of fact. The specifications provide: "Window Frames & Sash.—All the window openings,

excepting those specified as wood or that may be otherwise marked on the plans, shall be of iron built up of angles and flats riveted together with counter sunk rivet heads. Sash shall be rebated to receive leaded glass and shall be braced horizontally. Sash and frames shall be equal to those manufactured by G. J. Haase, No. 142 Center St., N. Y. City, and shall be secure, stiff and substantial in all their parts, and shall be made watertight." There is undisputed testimony that the specifications have been fulfilled. The windows were built up of iron, of angles, and flats riveted together with the required rivet heads. Sash were rebated, and braced horizontally. The plaintiff not only furnished sash and frames equal to those of G. J. Haase, but employed the latter as subcontractor. Haase had done previous satisfactory work for the architect on other jobs, and therefore his sash and frames were made the standard. To be sure to meet⸗the standard, the plaintiff called upon Haase to manufacture and install sash and frames. It is difficult to conceive what more the plaintiff should have done to meet the owner's every requirement. Under the MacKnight Case the construction does not seem unwarranted that if the plaintiff, instead of furnishing something merely as good as the standard, furnished the standard itself, the owner warranted its sufficiency. Had the specification read, "The sash and frames shall be those of G. J. Haase," the plaintiff would have been deprived of all discretion, and the MacKnight Case would be strictly in point. But, after all, the fundamental question is what was the intent of the parties. Defendants' testator certainly wanted a water-tight window. The architect, who had had dealings with Haase before, felt satisfied that his would meet the test. A discretion was given the plaintiff to furnish something equally as good, but it seems clearly to have been the intent that, if Haase's windows were supplied, they would be accepted as water-tight.

Even should this construction be erroneous, I am of the opinion that on the facts the plaintiff is entitled to recover for the installation of the sash and frames.

It is established that the contract provided that all the windows should open out. The preponderance of evidence shows that casement sash for a house located as this one, on high ground and exposed to severe wind and rainstorms, are properly so constructed. The architect admitted that a window opening out is safer than one opening in, and that it can more readily be made water-tight. He also testified: "Well, generally, I should recommend casement sash to open out." A number of experts were called, and the weight of their evidence is entirely in favor of having sash open out.

After the majority of the lower sash and frames of the first story had been manufactured, the owner, being desirous of changing the swing of the sash from out to in so as to permit the placing of screens, had the architect take up the question of the change. What preceded the architect's mandatory letter of September 19th, ordering the change, is not quite clear. The president of the plaintiff insists that when the architect first broached the matter to him, and asked whether sash opening in could be made water-tight, he stated his belief that they could not; that the architect then expressed great confidence in Mr. Haase, with whom he declared he would take up the matter. The architect has no recollection of discussing the question with plaintiff's president, and, referring to the assertion that windows opening in could not be made water-tight, declared the president "never made that statement to my knowledge." He had one or more conferences with Mr. Haase, at one of which he claims that a representative of the plaintiff was present, and at which Mr. Haase stated that sash opening in could be made water-tight. This, in turn, Haase denies. It is also disputed that a representative of the plaintiff was present. It is undisputed, however, that the architect sought Haase and conceded the greater difficulty in accomplishing the result. He testified: "I suggested that it would be more difficult to make them water-tight if they opened in. I turned to Mr. Haase and asked him if he could do it. He said he could; it would be more difficult and more expensive, but he could do it."

I am not prepared to find that the plaintiff, by its duly authorized representative present at the interview, consented to the change. The peremptory letter of the architect following the interviews does not indicate any agree-

ment or consent to make the change, although plaintiff's subsequent acts indicate acquiescence. On September 19, 1904, the architect wrote to the plaintiff: "When the iron frames and sash were first ordered, you were instructed to have them made to open out, and I understand that your subcontractor for this work has completed all the lower sash and frames of the first story except in the two large windows opening out of the main hall. * * * Instruct your subcontractor to make all other windows, that is the upper sash and transom of the first story windows, all sash and transoms to the large windows opening out of main hall to the easterly terrace, and all second and third story sash, all hinged and to open in." Pursuant to this letter, the remaining windows were swung to open in.

After a careful consideration of the whole testimony, I am led to the conclusion, which I think is established by the fair preponderance of the evidence, that the windows opening out were substantially water-tight, and that the leaking was primarily confined to some of the windows that opened in, and that the primary cause of the leaking was the fact that the windows did open in. Much technical evidence was offered by defendants to the effect that the water came through because there was only one instead of two points of contact between the sash and the window frames. I am satisfied that the establishment of an additional point of contact would not have made the Haase windows water-tight. Possibly and probably the condition might have been improved, but it does not meet the evidence that the same sash opening out would not leak, that the specifications called for sash opening out, and that the change was directed by the owner and architect without the consent of the contractor.

The defendants argue that the consent of the plaintiff must be implied because it did not object to the change, and that having consented it was obliged to make the windows water-tight, because the contract provides that in case "any changes in the work are made by the mutual consent of the parties hereto * * * all and singular the other provisions of this contract shall remain in force and apply to the contract as thus altered." I fail to find this "mutual consent." Instead of refusing to go on with the work and seeking its remedy by an action in damages, the plaintiff complied with the mandatory direction. Assuming an implied consent as a result of judicial construction, this is not the "mutual consent" contemplated by the contract. An express consent was contemplated or acts amounting to an express consent. The court should not be quick to hold that it was intended that the provision to make water-tight should survive the change directed, when, as a consequence of the change, the provision, if it could be complied with at all, could be done only at an expense of at least four times that originally estimated. The defendants offered evidence to show that the cost of substituting iron casement windows built up of flats and angles, and of a design that should be water-tight, even though opening in, would exceed $25,000. The amount paid Haase was something in excess of $5,000. It is to be borne in mind that the contract was somewhat different from the usual form of building contracts. The owner agreed to pay for all materials and labor at their actual cost, plus a fixed sum, constituting the plaintiff's compensation; there being a guaranty that the entire cost to the owner should not exceed a stipulated sum, and a provision that the owner should receive the benefit of all discounts, rebates, and the like. It is quite apparent that the owner estimated as well as the plaintiff, and that when window frames of the Haase standard were stipulated for the parties figured on the cost of such windows and not on some others costing four times as much.

It seems to me the defendants' testator received what he contracted for. For such consequences as may have resulted from the directed change the responsibility was his. If it should be held that the water-tight provision was not waived by the owner's act, or that it survived the direction "to open in," still under the MacKnight Case, and by the intent of the parties, it would still be true that the plaintiff has performed by following the standard set by the owner.

There should be judgment for the plaintiff.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, SCOTT, DOWLING, and MILLER, JJ.

F. Hulse, for appellants.
L. L. Delafield, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of the referee. Order filed.

---

## TAMASERIC v. BECKWITH.

(Supreme Court, Appellate Division, Fourth Department. May 3, 1911.)

1. MASTER AND SERVANT (§ 137*)—INJURY TO SERVANT—NEGLIGENCE—METHOD OF DOING WORK.

The method followed by direction by the master for placing in a trench iron pipes, each weighing 5,000 pounds, was to place over the trench, where the surface of the ground was soft, two skids, with a cleat nailed on one of them over the center of the trench, lower the pipe from the side hill above the trench, by ropes around trees, till the pipe struck the wedge, then let go the ropes; then place a four legged derrick over the pipe, and by means of it and a sling raise the pipe off the skids, and, the skids being removed, lower it into the trench. *Held*, the method was improper and dangerous, making the master liable for injury to a servant injured, while placing the derrick in place, by the skid, on which was the cleat, turning over, allowing the pipe to roll further.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 137.*]

2. APPEAL AND ERROR (§ 1070*)—HARMLESS ERROR—FINDINGS.

Defendant in action for injury to his servant cannot complain of the answer in the negative to the question submitted to the jury: Did defendant furnish to his servants reasonably proper and safe tools and appliances, though there was no evidence that he did not furnish proper tools, the conclusion that he did furnish proper appliances being justified, and the court not having been asked to distinguish between tools and appliances.

[Ed. Note.—For other cases, see Appeal and Error, Dec. Dig. § 1070.*]

3. MASTER AND SERVANT (§ 107*)—INJURY TO SERVANT—IMPROPER "APPLIANCES"—EMPLOYER'S LIABILITY ACT.

As regards the question of furnishing proper appliances, skids laid over a trench and onto which iron pipes are rolled, to rest there till raised and lowered into the trench by means of a derrick, are appliances within the meaning of the employer's liability act (Consol. Laws 1909, c. 31, §§ 200–204).

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 107.*

For other definitions, see Words and Phrases, vol. 1, p. 455; vol. 8, p. 7578.]

4. MASTER AND SERVANT (§ 252*)—INJURY TO SERVANT—EMPLOYER'S LIABILITY ACT—NOTICE.

The notice under the employer's liability act (Consol. Laws, 1909, c. 31, §§ 200–204) of injury to an employé, stating that the master failed to provide and adopt a proper and safe method of work, need not state that the improper method of doing the work had been adopted by defendant's superintendent, rather than by defendant; the superintendent, so far as appears, having been the alter ego of defendant.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 806; Dec. Dig. § 252.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes