STATE OF NEBRASKA, APPELLANT, V. COMMERCIAL CASUALTY INSURANCE COMPANY, APPELLEE.

FILED JUNE 9, 1933. No. 28520.

44

Paul F. Good, Attorney General, and William H. Wright, for appellant.

C. L. Clark and J. B. Chambers, contra.

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY and PAINE, JJ.

GOOD, J.

This is an action against the surety on a guaranty bond, to recover damages caused by the principal's alleged breach of a construction contract. Defendant had judgment, and plaintiff has appealed.

Plaintiff let to W. H. Pearce & Company a contract to construct a high pressure steam pipe line, extending from the state's heating and power plant, located on the University campus in Lincoln, to the state capitol, for the purpose of furnishing heat to the capitol building. The state employed two firms of engineers, one located in Lincoln and the other in Kansas City, the latter known as consulting engineers, and entered into contracts with these engineering companies to prepare plans, specifications and details for the construction and installation of the pipe line and for the superintending of such construction by said engineers. These engineering companies prepared plans, specifications and details for the pipe line. Public notice was given to prospective bidders and proposals received from such bidders for the construction of the pipe line. The contract was awarded to Pearce & Company, hereinafter referred to as the contractor. The contract required the contractor to give a bond for the faithful performance of the contract, according to plans

and specifications, under the supervision of the state's engineers. The contractor, with defendant as surety, executed such a bond. The contract provided that the notice to bidders, the proposal of the successful bidder, the plans, specifications, details and the bond of the surety company should all constitute a part of the contract.

The contract required installation of a steel pipe line, part of which should be 10 inches in diameter and the remainder 8 inches. The 10-inch part of the pipe line was to be installed in a tunnel extending from the heating plant a distance of several hundred feet, and from thence an 8-inch steel pipe in a conduit which would extend to the capitol building. The contract provided for expansion joints at the points designated on the blue prints, and also provided for manholes at each expansion joint in the conduit. It further provided that the expansion joints should be of Ferrosteel, extra heavy pattern, and provided for not more than 5-inch expansion at each joint. It also provided that in the tunnel the 10-inch pipe should be anchored to the wall of the tunnel, and that anchors should be placed at each expansion joint and midway between the expansion joints. There was also a general provision that the pipe line should be suitable for carrying steam at a pressure of 250 pounds to the square inch and superheat of 150 degrees.

The state charged in its petition that the expansion joints were not of extra heavy pattern and were not suitable and safe for carrying steam at 250 pounds pressure and 150 degrees superheat; that the anchors were insufficient; that insufficient expansion was provided for; that the expansion joints should either have been placed closer together, or a greater expansion provided for, in each joint, and alleged other shortcomings, which we need not mention. Defendant answered, alleging that its principal, the contractor, had fully and completely performed its contract, according to the terms and specifications; that the contract provided for the work to be performed under direction and supervision of the plaintiff's engi-

neers; that they had approved all the work and materials furnished; had made monthly estimates which had been paid, and, on the completion of the work, had made a final estimate and approved the work as a completed whole, and that plaintiff had paid therefor.

Plaintiff claims that the court committed prejudicial error in admitting, over objection, evidence of tests, made by experts, of certain materials similar to some of those used in the construction of the pipe line, because the tests were made of materials that were not manufactured or fabricated at the same time as those used in the pipe line. The evidence shows that the tests were made of materials, manufactured by the same foundry, of like ingredients, in the same proportion, and under a similar condition to those that were used in the pipe line. We are cited to no authority holding that such tests are not competent, and, since they were of materials of the same character, in all respects, as those used by the contractor, we fail to perceive why the evidence was not admissible. Evidence of tests of tensile strength of similar materials to those in controversy and made under like conditions is competent as tending to prove the tensile strength of materials actually used by the contractor.

Plaintiff complains because, over objection, the court received evidence to the effect that the state's engineers were daily on the job during the construction of the pipe line, inspecting and superintending the work done and materials used, and that such engineers approved the material and work. The contract provided for such inspection and supervision and empowered the state's engineers to reject any and all material and any work that did not meet the contract requirements. There is no charge that the engineers acted in bad faith, or were negligent in the performance of their duties. They were standing in the place of and acting for the state, and their approval of the work and material tends to sustain the allegations of defendant's answer that the work was performed in all respects according to the terms and conditions of the contract.

Where a contract for the construction of a steam pipe line makes the engineers of the owner supervising agents, with power to reject any material or work that does not comply with the terms of the contract, and authorizes the engineers to approve and issue final certificate, such certificate of approval by the engineers constitutes at least *prima facie* evidence that the work has been performed according to the contract. *Freygang v. Vera Cruz & P. R. Co.*, 154 Fed. 640; *Jefferson Hotel Co. v. Brumbaugh,* 168 Fed. 867; *Brownwell Improvement Co. v. Critchfield,* 197 Ill. 61.

Plaintiff argues that the court erred in admitting certain evidence of what it terms preliminary negotiations between the state and the contractor, prior to the execution of the contract. There are certain provisions of the contract that are inconsistent with each other, and technical terms are used, concerning whose meaning engineering experts differ. With respect to the contradictory terms of the contract, in one or two instances, the conversations of the parties immediately prior to entering into the contract tend to show which of the inconsistent provisions was intended to be followed, and where there was ambiguity in the contract, evidence was admissible to show what the parties intended.

Parol evidence is admissible to show the meaning of technical terms in a written contract. 13 C. J. 532. A written instrument is open to explanation by parol evidence when its terms are susceptible of two constructions, or where the language employed is vague or ambiguous. 22 C. J. 1174, 1175. Such evidence is admitted, not for the purpose of contradicting the terms of the contract, but for ascertaining and giving effect to the true intent of the parties.

In *Myers v. Persson,* 94 Neb. 467, it was held: "Ambiguity in a written instrument may be explained by oral testimony showing the mutual understanding of the parties." See, also, *In re Estate of Enyart,* 100 Neb. 337.

Plaintiff complains of the giving of a number of in-

structions. The principal complaint in this respect relates to submitting to the jury the interpretation and meaning of the contract in certain respects. It is contended that the construction and meaning of the contract was exclusively for the court and should not have been submitted to the jury. It may be conceded that it is a general rule that the construction or interpretation of a written instrument belongs to the court and is, ordinarily, not for the jury to determine, but there are exceptions. Where there are contradictions in the written instrument itself, where there are ambiguities, and where the evidence relating to these ambiguities and to the contradictory provisions is in conflict, the interpretation to be given the contract in this respect becomes a question of fact and one that is properly submitted to the jury.

Where a technical term is used in a contract, and expert witnesses differ as to its meaning and what it implies, and the evidence relating thereto is in conflict, then the matter becomes a question of fact for the jury. Under the state of facts disclosed by the record, the instructions of which plaintiff complains were properly given.

Much stress is laid upon a provision of the contract that the pipe line should be suitable for carrying steam at 250 pounds pressure to the square inch and superheat of 150 degrees. It is contended that this is a warranty that the pipe line, when completed, will be suitable for such purpose. It is a rule that, where there are general and special provisions in a contract, relating to the same thing, the special will control over the general provisions, and, if the contract is fulfilled according to the special provisions, the contractor has fully complied with the terms of his contract. Whether the pipe line, as designed by plaintiff's engineers, and the specific material required and manner of construction were sufficient were questions on which the contractor was not required to pass judgment. Its duty was to perform and fulfil the contract according to the specific terms and directions therein.

It is contended that the expansion joints should have been of cast steel and that Ferrosteel was not suitable and did not possess the tensile strength to safely carry steam at the stipulated pressure and temperature. The contract, in express terms, provided that the expansion joints should be of Ferrosteel. The evidence of defendant tends to show that they were made of Ferrosteel, and that they were sufficiently heavy and possessed the tensile strength to carry the steam at the designated pressure and temperature. In any event, the contract prepared by plaintiff's engineers designated Ferrosteel as the material for the expansion joints. The contractor was required to furnish that material and not something better.

Where plans and specifications for an improvement are prepared by engineers of the owner, who are to inspect and supervise the construction and see to it that materials are furnished and work performed in accordance with the specifications, ordinarily the contractor is not liable for the sufficiency of the specifications, but only for the skill with which he performs the work and the soundness of the materials used by him. 6 R. C. L. 868, sec. 254; 9 C. J. 745, 746; *Bush v. Jones,* 144 Fed. 942; *Bentley v. State,* 73 Wis. 416.

In the case of *Friederick v. County of Redwood,* 153 Minn. 450, it was said: "Where a contractor makes an absolute and unqualified contract to construct a building or perform a given undertaking, it is the general, and perhaps universal, rule that he assumes the risks attending the performance of the contract, and must repair and make good any injury or defect which occurs or develops before the completed work has been delivered to the other party. But where he makes a contract to perform a given undertaking in accordance with prescribed plans and specifications, this rule does not apply. Under such a contract he is not permitted to vary from the prescribed plans and specifications even if he deems them improper and insufficient; and therefore cannot be held to guarantee that work performed as required by them will be free

from defects, or withstand the action of the elements, or accomplish the purpose intended. Where the contract specifies what he is to do and the manner and method of doing it, and he does the work specified in the manner specified, his engagement is fulfilled, and he remains liable only for defects resulting from improper workmanship or other fault on his part."

In *Reinhart Construction Co. v. Baltimore,* 157 Md. 420, it was said: "Generally, when a contract prescribed materials chosen entirely by the owner or engineer, and the contractor has no choice in respect to them, the contract cannot be construed to impose on the contractor an undertaking that the materials chosen will meet the demands to be made upon them. *United States v. Spearin,* 248 U. S. 132, 136; *Bentley v. State,* 73 Wis. 416; *Southgate v. Sanford & Brooks Co.,* 147 Va. 554. Even a general guaranty of good condition during a period subsequent to completion has been construed not to include liability for mistake or miscalculation in an architect's plans. * * * It is not an intention that would be expected, or be reasonably inferred from a general guaranty of work to be done." See, also, *Oklahoma City v. Derr,* 109 Okla. 192; *Louisiana Ship Bldg. Co. v. Bing Dampskibsaktieselskab,* 158 La. 548.

In *Tide Water Bldg. Co. v. Hammond,* 129 N. Y. Supp. 355, it was held that a building contractor, guaranteeing a roof to be water-tight, was not bound to do more than the specifications required to make it so. To the same effect are *Harlow & Co. v. Borough of Homestead,* 194 Pa. St. 57; *Adams v. Tri-City Amusement Co.,* 124 Va. 473; *Morse, Williams & Co. v. Puffer,* 182 Mass. 423; *Filbert v. City of Philadelphia,* 181 Pa. St. 530; *MacKnight Flintic Stone Co. v. The Mayor,* 160 N. Y. 72.

Plaintiff contends that the expansion joints should have provided for a greater expansion, or that there should have been more joints. The specifications in the contract indicate just how many and where the expansion joints should be placed, and provide for an expansion of not

to exceed five inches for each joint. In this respect, the contractor complied with the terms of the contract. If the expansion for each joint was insufficient, or if there should have been more expansion joints placed in the line, this was not the fault of the contractor. It was the defect in the plans and specifications, provided by plaintiff's engineers. However, the evidence on behalf of defendant tends to show that the expansion provided for was sufficient to meet the requirements of the desired operating conditions.

Plaintiff also contends that the anchors were not extra heavy and did not comply with the specifications. The contract provided that the anchors should be of Crescent type, extra heavy pattern. The evidence tends to show that the Crescent type anchor is manufactured by only one company, and that it has three different patterns for such work, known as light, standard and extra heavy pattern, and that the anchors used were Crescent type and extra heavy pattern, and strictly complied with the terms of the contract.

It is contended that the pipe line was not suitable for operation, because tie rods, or limiting bolts, were not installed over the expansion joints. It is a sufficient answer in this respect to say that the specifications and details did not call for such rods or bolts, and the contractor was not required to install other devices than those provided for in the contract.

The contractor completed the pipe line about the 1st of February, 1930. The north end of this pipe line was to reach to, or possibly into, the plaintiff's power and heating plant. At the time of the completion of the pipe line only the footings for the wall of the plant building had been laid. The north expansion joint in the pipe line was within about 20 feet of where the south wall of the plant building would be. One joint of pipe, 20 or 22 feet long, with a sleeve bolted to one end, was required to complete the full length of the pipe line. The end with the sleeve was inserted in the expansion joint, and the other was held by a chain loop, passing under the joint

of pipe, and both ends of the chain fastened to an I beam in the top of the tunnel. About six months after the completion of the pipe line, the plant wall had been constructed, the steam headers and steam pipes in the building installed, and a connection made between the steam pipe in the building and the pipe line by welding the two together. This was done by another contractor, who installed the part of the heating plant within the building. After this connection was made, an anchor was bolted to the wall of the tunnel a few feet from the power house wall, to which anchor a wire cable was fastened, extending through a thimble in the wall, around another steam pipe, back through the thimble, and fastened to the anchor by means of a turn buckle and hook. About September 6, 1930, when steam was first turned into the pipe line, with 250 pounds pressure, the hook on the turn buckle broke, permitting the cable to slack and the steam pipe to be pushed out of the expansion joint. Plaintiff insists that it was the duty of the contractor to provide for this anchor, and that the anchor so provided was defective and insufficient.

The plans and specifications did not require the contractor to install an anchor between the last expansion joint and the power house wall. The evidence as to who did install the anchor, whether it was done by the contractor for the pipe line or by the contractor for installing the heating plant within the building, is in conflict. The question of any liability for the faulty or defective cable anchor is, in the final analysis, a question of fact, like most of the other questions presented by the record, and concerning which the evidence is in conflict. The issues of fact were, in our opinion, fairly submitted to the jury. It is a well-recognized rule that the verdict of a jury, based on conflicting evidence, will not be disturbed unless clearly wrong.

Our attention has not been called to any place in the record disclosing error prejudicial to the plaintiff. Judgment

AFFIRMED.