ELY CONSTRUCTION COMPANY, A CORPORATION, APPELLANT, v. S & S CORPORATION, A CORPORATION, APPELLEE.

165 N. W. 2d 562

Filed February 28, 1969. No. 36964.

Swarr, May, Royce, Smith, Andersen & Ross and William E. Morrow, Jr., for appellant.

Edward Shafton and Bernard E. Vinardi, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH, McCown, and NEWTON, JJ.

McCown, J.

The plaintiff, Ely Construction Company, instituted this action against the defendant S & S Corporation, to recover damages for breach of a written contract. The defendant cross-petitioned for loss of expected profits. The jury found against the plaintiff on its petition and against the defendant on its cross-petition, and the plaintiff has appealed.

The specific issue is the application of the parol evidence rule to a written subcontract to furnish and install window units for a dormitory addition at Offutt Air Force Base.

The plaintiff is a Nebraska corporation engaged in a general contracting business. The defendant was a Nebraska corporation engaged in the business of selling aluminum building products. It did not sell anything other than aluminum products.

In early February 1965, the plaintiff informed the defendant's sales representative that plaintiff would be interested in having defendant bid on certain construction jobs. Among them was the Offutt dormitory addition. On February 26, 1965, the defendant delivered proposals on two other jobs, both of which involved aluminum products. The defendant's sales representative obtained a copy of the plans and specifications for the Offutt dormitory addition sometime in February, and on March 8, 1965, submitted a bid proposal to the plaintiff for furnishing and installing the window units. The bid proposal was on a printed form of the defendant, S & S Corporation. The typewritten portion of the form proposed to furnish and install: "24 Mark '1', 6 Mark '2', 22 Mark '4', 27 Mark '6', 4 Mark '5' and 2 Mark '5A' consisting of: Alenco series 900 hopper vents, shop glazed w/DSB. glass. Alenco series 1600 panel frames, shop glazed w/⅝" insulating glass. Alenco series 1600 panel frames, shop glazed w/1⅛" porcelain panels (porcelain one side).

"We include #608 closure @ heads & jambs, #1742-B mullions, screens for operating vents and clip anchors at sills.

"All in 204-R1 alumilite finish.

"We include necessary labor, tools, insurance and equipment to erect.

"We exclude: opening preparation, cleaning or protection of aluminum surfaces.

"We include perimeter caulking.

"All work to be done in standard 40 hour work week."

The bid price was $17,397.88. Alenco was the trade-name of the aluminum manufacturing company.

This bid proposal was delivered to the plaintiff on March 8, 1965, and at that time, Mr. Harold Stinson, defendant's sales representative also delivered an architectural kit containing advertising and architectural information about the aluminum units defendant was bidding. He also advised plaintiff's representative, Mr.

Anderson, that the plans and specifications called for steel units and that defendant's bid was on aluminum, which should be used as an alternate.

Mr. Anderson also knew from the defendant's bid proposal itself, that it was for aluminum products and not for steel, and he knew this prior to the time the plaintiff submitted its bid for the general contract. Plaintiff had received at least one other bid proposal on the window units which was from Porter Trustin Company, which ultimately furnished and installed the windows. There is no evidence as to which proposal was used as the basis of plaintiff's bid, and there was an obvious and substantial difference in price. The plaintiff was the successful bidder on March 11, 1965, and on April 29, 1965, plaintiff executed a contract with the United States Army Corps of Engineers for the general construction in the sum of $429,330.

On May 5, 1965, at the plaintiff's offices, the defendant's representative, Mr. Stinson, was told that the subcontract was prepared and ready for signature. The subcontract had been prepared by the plaintiff on its printed form with typed additions, and was handed to Mr. Stinson for signature. He checked the heading and the typewritten section and also the price stated. He noted the price was 12 cents higher than his bid proposal, and the plaintiff's representative, Mr. Anderson, explained that this had been done to facilitate plaintiff's bookkeeping by eliminating pennies. Mr. Stinson testified that: "* * * assuming that the subcontract had been prepared according to my proposal, I signed it."

The typewritten portion of the printed subcontract form was: "Furnish & install window units according to plans & specifications, including closures at head & jambs, mullions, screens for operating vents, clip anchors at sill, glazing, porcelain panels, perimeter caulking & necessary labor, tools, insurance & equipment to erect. Opening preparations, cleaning & protection by others. Approximate Quantities 24 - Mark 1, 6 - Mark 2, 22 -

Mark 4, 27 - Mark 6, 4 - Mark 5, 2 Mark 5A."

Section 10 of the government specifications is titled "METAL WINDOWS." Section 10-01 provided: "APPLICABLE PUBLICATIONS. The following publications of the issues listed below, but referred to thereafter by basic designation only, form a part of this specification to the extent indicated by the references thereto: a * * * b. STEEL WINDOW INSTITUTE PUBLICATION. Recommended Standards for Steel Windows - (1964)."

Section 10-02 of the specifications provided: "MATERIALS AND TYPES. Unless otherwise indicated, windows and window wall shall match existing windows and insulated panels in every detail. Existing windows are Fenmark II by Fenestra, Inc., and insulated panels are Davidson Enamel Products, Inc."

Section 10-06 provided: "STEEL WINDOWS shall conform to the S.W.I. Recommended Standards for Steel Windows, except as modified herein."

Paragraph 9 of the General Provisions of the specifications, in brief, provided that reference to any material was regarded as a standard of quality and permitted substitution of any material, article, or process which, in the judgment of the contracting officers, was equal to that named. It required submission of various data to the contracting officer and his specific approval. There was evidence that on occasion the government had permitted substitution of aluminum for steel under this provision, and that the parties were aware of that fact.

Section 10-03 of the specifications required complete shop drawings to be submitted to the contracting officer for approval prior to acquisition of materials and equipment.

The plans designated the window units as "Type 1, Type 2, Type 4, Type 5, Type 5A and Type 6." The plans do not designate any material such as wood, steel, aluminum, or metal for the window units, although an experienced builder could determine that they required

metal. The quantities of each type of window may be obtained only from the plans.

Albritton Engineering Corporation, which produced the aluminum window walls involved in the March 8, 1965, proposal of the defendant, prepared complete shop drawings for the window units. These drawings also showed the material to be aluminum. The defendant delivered these to the plaintiff sometime prior to June 9, 1965, and on that date, the plaintiff forwarded the shop drawings to the Corps of Engineers for approval. Plaintiff's submittal stated: "Equipment and Materials covered by this transmittal conform in all respects to the contract plans and specifications." On June 21, 1965, the government returned the shop drawings without acceptance and stated as the reason: "1. The contract specifications require steel windows, without option. The shop drawings are for aluminum windows which are not permitted by the specifications.

"2. Specifications Paragraph 10-02 requires that the windows shall match in every detail those on the existing dormitories. The submitted windows are different in appearance from the existing windows to the extent that this difference would be immediately recognized.

"Shop drawings shall be resubmitted showing windows conforming to the requirements of Section 10 of the Contract Specifications."

On several occasions, beginning on March 11, 1965, Harold Stinson, the representative of the defendant, had conferred with Mr. Anderson, the representative of the plaintiff, as to who would talk to the government about approving the aluminum substitution, and on each occasion, Mr. Anderson had said that he would. Even after the rejection of the shop drawings by the government, there is testimony that Mr. Anderson informed Mr. Stinson that Mr. Anderson was going to see the Corps of Engineers to try once more to have the specifications changed from steel to aluminum. Another employee of the plaintiff also talked to the government representa-

tive about accepting and approving aluminum units after the shop drawings were returned. Apparently in late June or early July 1965, Mr. Anderson informed Mr. Stinson that the government would not accept aluminum windows. Thereafter the plaintiff obtained the material and labor for the window construction from Porter Trustin Company, on its original proposal, with glazing from another company, at a cost of $35,075, or $17,677 more than the defendant's subcontract price.

The jury was instructed that among the requirements to be proved by the plaintiff was that the May 5, 1965, subcontract was to furnish and install steel window units; and that among the requirements to be proved by the defendant on its cross-petition was that the subcontract was to furnish and install aluminum window units. No assignment of error is directed at any of the instructions as given. The jury returned its verdict against the plaintiff on its petition and against the defendant on its cross-petition.

The only real issue on this appeal is whether the plaintiff was entitled to a directed verdict on the basis of the parol evidence rule. Unless it was, the evidence is sufficient to sustain the verdict.

The parol evidence rule is well analyzed in 3 Corbin on Contracts, c. 26, §§ 573-596, p. 356 et seq. That work states the rule in substance to be: "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." § 573, p. 357.

A fundamental and indispensable basis of any enforceable agreement is that there be a meeting of the minds of the parties. Farmers Union Fidelity Ins. Co. v. Farmers Union Co-op Ins. Co., 147 Neb. 1093, 26 N. W. 2d 122.

Ordinarily there must be a clear and unequivocal ac-

ceptance of a certain and definite offer in order to constitute a contract. See Joseph v. Donover Company, Inc., 261 F. 2d 812. See, also, 1 Corbin on Contracts, § 107, p. 478.

A written contract expressed by clear and unambiguous language is ordinarily not subject to interpretation or construction. Hansen v. E. L. Bruce Co., 162 Neb. 759, 77 N. W. 2d 458. Obviously, where the language and meaning of a written contract are not clear and unambiguous, it must be interpreted or construed.

If the written agreement of May 5, 1965, had said only: "Furnish and install window units in accordance with plans and specifications" there might well have been no ambiguity. Ambiguities were introduced not only by the descriptions of the window units as "Mark" rather than "Type," but by the addition of many other items contained in the proposal of March 8, 1965, which had reference to aluminum only. The references to that proposal, together with the evidence as to execution, might well be interpreted as referring to both the proposal and the plans and specifications. If so, the ambiguity and conflict is obvious. It is of interest to note that the subcontract plaintiff made on July 28, 1965, with the company which finally furnished and installed the window units for the Offutt dormitory contained a typewritten portion which read: "Furnish and install window units as per proposal of March 9, 1965 and according to plans and specifications."

A cardinal principle of construction of written instruments is that an interpretation shall be made which will reflect the true intention of the parties. U. P. Terminal F.C.U. v. Employers M. L. Ins. Co., 172 Neb. 190, 109 N. W. 2d 115.

In interpreting a written contract, the meaning of which is in doubt and dispute, evidence of prior or contemporaneous negotiations or understandings is admissible to discover the meaning which each party had reason to know would be given to the words by the other

party. Podewitz v. Gering Nat. Bank, 171 Neb. 380, 106 N. W. 2d 497; 3 Corbin on Contracts, § 579, p. 418. See, also, Restatement, Contracts, § 230, p. 310, § 231, p. 312, § 242, p. 341. As stated in the latter section: "Previous negotiations by the parties to an integrated agreement, whether the negotiations relate to that agreement or another, are admissible to show that the agreement has any meaning which is not impossible under the standard stated in § 230, although that meaning would not otherwise have been given to the agreement."

Where evidence relating to ambiguities and contradictory provisions in a written contract is conflicting, the interpretation to be given the contract is for the jury. State v. Commercial Casualty Ins. Co., 125 Neb. 43, 248 N. W. 807, 88 A. L. R. 790. As this court said there: "A written instrument is open to explanation by parol evidence when its terms are susceptible of two constructions, or where the language employed is vague or ambiguous. * * * Such evidence is admitted, not for the purpose of contradicting the terms of the contract, but for ascertaining and giving effect to the true intent of the parties."

Parol evidence is generally admissible when it is offered for the purpose of explaining and showing the true nature of the transaction between the parties. Fitzsimmons v. Frey, 153 Neb. 124, 43 N. W. 2d 531.

In discussing the parol evidence rule, Corbin states: "The use of such a name for this rule has had unfortunate consequences, principally by distracting the attention from the real issues that are involved. These issues may be any one or more of the following: (1) Have the parties made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate 'integration' of that contract?

"In determining these issues, or any one of them, there is no 'parol evidence rule' to be applied. On these

issues, no relevant evidence, whether parol or otherwise, is excluded. No written document is sufficient, standing alone, to determine any one of them, however long and detailed it may be, however formal, and however many may be the seals and signatures and assertions. No one of these issues can be determined by mere inspection of the written document." 3 Corbin on Contracts, § 573, p. 358.

Virtually all of the issues that are raised in the application of the parol evidence rule are issues of fact. See 3 Corbin on Contracts, § 595, p. 570.

This court cannot say, as a matter of law, that there was a meeting of minds and mutual assent sufficient to establish that a contract was made; that there were no mistakes or that whatever mistakes there were, were so negligible that they could not render the contract, if made, voidable; nor that the parties assented to the particular writing as the complete and accurate integration of the agreement; nor that the language used in the writing is so definite and unambiguous that it can have only one legal meaning. Yet every one of these issues must be determined affirmatively, as a matter of law, if the parol evidence rule is to be applied here to overturn the verdict of the jury to whom these issues were submitted.

The factual issues here were properly for the jury, the evidence is sufficient to sustain the verdict, and the judgment of the district court is affirmed.

AFFIRMED.

WHITE, C. J., dissenting.

I respectfully dissent. The appellant was a general contractor for the government, and the appellee was a subcontractor, employed to install windows. The contract, of course, had to meet government specifications. The appellee submitted a proposal which by its terms was not to become a contract until it was signed by the appellant and delivered to appellee at its office in Gretna,

Nebraska. The proposal was never accepted and this is admitted. The evidence is conclusive that the appellee was aware of the prime contract requirements for the window units. It is also clear that the appellee knew that the subcontract tendered to it, and executed and delivered by it, was not the same as the proposal which it had made.

The parties here were dealing at arms length, and we have no issue concerning unequal position, fraud, misrepresentation, or estoppel. It is my opinion that the parol evidence rule as stated by this court in many cases should be enforced. See, Master Laboratories, Inc. v. Chesnut, 157 Neb. 317, 59 N. W. 2d 571; Frentzel v. Siebrandt, 161 Neb. 505, 73 N. W. 2d 652. This case would appear to be complex from the involved arguments of the appellee herein. I feel that its position is nothing more than an ingenious attempt to weave its rejected proposal into the terms of the finally executed written subcontract. The attempt to place the proposal under the umbrella of the executed contract by the assertion of ambiguity cannot be accepted. These proposals or "prior negotiations" are inconsistent with the final contract which provided by proper interpretation for steel windows. In Gerdes v. Omaha Home for Boys, 166 Neb. 574, 89 N. W. 2d 849, this court said as follows: "The correct doctrine in that regard means that if there is a provision in one instrument affecting a provision of another, they will be given effect * * * so that the whole agreement actually made may be determined and effectuated. It does not mean that a provision of one document is imported bodily into another contrary to the intent of the parties or the express provision of the latter. * * * The statement that contemporaneous instruments may be treated as one means only that this will be done when it will effectuate the intention and if the provisions of the two instruments if put together will not be incompatible. *The court may not do violence to a complete, unambiguous contract by consolidating it*

*with another writing if the effect of doing so would be to avoid an essential part of the contract."* (Emphasis supplied.)

As far as I can discover, there is no effective evidence to support a finding that any legal mistake occurred in the formation of this contract. In any event it is clear that if a party has taken a position that there is in fact a contract he cannot claim a mistake that negates the contract. His remedy is by rescission which is not pleaded or contended here. Sack Lumber Co. v. City of Sargent, 179 Neb. 848, 140 N. W. 2d 796.

For the reasons given, I dissent from the majority opinion. It is my conviction this judgment should be reversed and the petition dismissed.

I am authorized to say that Spencer, J., concurs in this dissent.