**WESTERN SECURITIES COMPANY, a corporation, Appellant,**

**v.**

**NATIONAL RESERVE LIFE INSURANCE COMPANY, a corporation, Appellee.**

**No. 77–1389.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 18, 1977.

Decided Feb. 8, 1978.

---

Ronald W. Hunter, Omaha, Neb., for appellant; Duane M. Katz of Hunter, Houlihan & Katz, Omaha, Neb., on brief.

C. E. Heaney, Jr., Omaha, Neb., for appellee; Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., on brief.

Before WEBSTER and HENLEY, Circuit Judges, and SMITH, Senior District Judge.*

WEBSTER, Circuit Judge.

The issue presented on appeal in this case is whether appellant's mortgage loan servicing contract was properly terminated under a clause in the agreement permitting cancellation without penalty under certain circumstances.[1]    The District Court ruled against appellant.   We affirm.

---

\* The Honorable Talbot Smith, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

1.  The action was instituted in state court by Western Securities but was removed to the

The basic facts of the case are not in dispute.[2] Western Securities Co. is engaged in the mortgage banking business, the principal features of which are (1) making loans secured by mortgages, (2) selling these loans to institutional investors, and (3) continuing to service these loans for institutional investors.[3] For a considerable number of years, National Reserve had been a purchaser of mortgage loans from Western Securities. The Servicing Agreement that is the subject of the controversy here was drafted by National Reserve, and entered into by the parties, in November 1964. The Agreement gave National Reserve the right to terminate the servicing contract without cause upon thirty days notice and the payment of a termination fee equal to one percent of the unpaid balance of the outstanding mortgages, or to terminate for cause without penalty.[4] This contract was drafted by Ross L. Laybourn, Vice-President and Treasurer of National Reserve, after reviewing similar contracts and accepted for Western Securities by E. C. Spelman, Sr., who at the time was president of that company.

In all of the years between 1964 and July of 1975, no one individual, entity, or family group controlled more than 30% of the voting stock of Western Securities. There were, however, three identifiable voting groups that existed during most of this period and a fourth that arose in 1975. The "Spelman group" was headed by E. C. Spelman, Sr., and until early 1975 combined with the "Rasmussen group" to elect a majority of the directors of the company. The "Sparling-Butters group" was in existence subsequent to 1966, but its strength diminished over the years due to the death of

District Court, the Honorable Robert V. Denney, United States District Court, for the District of Nebraska, by National Reserve. Jurisdiction was based upon diversity of citizenship, 28 U.S.C. § 1332.

**2.** The facts were summarized by the District Court in a memorandum opinion of October 7, 1976, denying both parties' motions for summary judgment and were subsequently agreed to by the parties in the Order on Pretrial Conference filed November 17, 1976.

**3.** In his opinion, Judge Denney described the servicing function as involving the following steps:

(a) collecting monthly installments of principal and interest and deposits for payment of taxes and insurance premiums; (b) approving, depositing and remitting the periodic payments received from borrowers; (c) ascertaining that taxes and insurance premiums are paid; (d) taking appropriate collection steps with regard to delinquent loans; (e) maintaining appropriate accounting records; (f) complying with the regulations of federal loan insurance agencies where applicable; (g) supervising and handling foreclosure actions; and (h) handling arrangements for change of ownership of the property and termination of loans.

**4.** The termination provisions are contained in ¶ 22 of the agreement.

22. The Company [National Reserve] shall have the right to take over the servicing of any or all loans, and will then be entitled to all future payments made by borrowers, and the escrow deposits then on hand, all interest in which the Correspondent [Western Securities] will thereupon relinquish, and the Company will relieve the Correspondent of subsequent responsibility in connection with said loans under the following conditions:

(a) At the option of the Company, without cause, upon thirty (30) days notice and payment to the Correspondent of a sum equal to one percent (1%) of the then unpaid balance of mortgages taken over;

(b) If the Correspondent shall commit fraudulent or dishonest action upon any person, corporation or other party, or if the Correspondent shall breach this contract, or in the event a receiver, trustee, conservator, or other legal representative is appointed to or for the Correspondent, or should the Correspondent become otherwise incapacitated by operation of law or fact for the faithful or proper performance of its duties hereunder, upon written notice to the Correspondent.

One event giving rise to the right to terminate without cancellation penalty is defined in ¶ 19.

19. The Correspondent shall not have the right to sell, lease, assign or otherwise transfer the servicing of the Company's loans, and if the Correspondent shall merge with another company, *or should any controlling interest in the ownership of the Correspondent be transferred,* the Company shall have the right to terminate this agreement under the provisions of paragraph 22(b) below. (emphasis added)

It is this provision, and especially the emphasized portion, that is the source of the controversy in this case.

some of its members and the disposition of their stock.

At the annual shareholders meeting of February 27, 1975, the Spelman group and the Rasmussen group divided. Following this meeting, Charles A. Rasmussen, head of the Rasmussen group, invited the "Johnson group" to acquire an interest in Western Securities, and pursuant to a voting trust agreement dated April 28, 1975, the Rasmussen group placed 3,056 shares of Western Securities stock in escrow pending the acquisition of shares by the Johnson group. By July 15, 1975, the date on which the Voting Trust Agreement took effect, the Johnsons had acquired 3,528 shares. The Rasmussen shares represented approximately 25.5% of the outstanding stock of Western Securities; the Johnson total, 29.4% of the outstanding stock. Thus, the combined total of 6,584 shares transferred to the voting trust represented 54.9% of Western Securities' stock. At the same time the two groups entered into the Voting Trust Agreement, they also executed a Buy-Sell Agreement dated April 18, 1975, which provided that upon the happening of certain specified events, one group was entitled to buy out the stock of the other.

Spelman learned that contracts to purchase stock were entered into by the Johnson group on May 14, 1975. He was asked to continue as president of the company but, after consideration, he declined the invitation. In late June, he sent a letter to investors informing them of the anticipated change in corporate management. Learning of these events from Spelman's letter and from a news release, National Reserve sent a letter to Western Securities advising them of National Reserve's intention to terminate the Servicing Agreement under ¶¶ 19 and 22(b) "if, in fact, the events described in the news release have taken place." National Reserve did in fact terminate the agreement.

In its action against National Reserve, Western Securities prayed for judgment in the amount of $113,867.48 under the one percent penalty clause. In addition to denying liability under the contract, National Reserve filed a counterclaim for approximately $108,000.00, which it claimed was being wrongfully withheld by Western Securities.

The parties agreed that the issue before the District Court was: "Whether Paragraph 19 of the Servicing Agreement dated November 20, 1964 should be interpreted to apply to the plaintiff's stock transfers and to the other corporate arrangements with respect to plaintiff occurring in 1975 and preceding the defendant's termination of the Servicing Agreement." The District Court found that the phrase in issue must be given its ordinary meaning and held that "the transfer of 54.9% of the voting stock to a voting trust constitutes transfer of a controlling interest in the ownership of a corporation." Accordingly, it entered judgment in favor of National Reserve on its counterclaim in the amount of $102,699.70 plus interest from July 1, 1975. The same stipulated issue before the District Court is now presented to us in this appeal.

It is axiomatic that an interpretation should be given to a written document which will give effect to the true intention of the parties. *See, e. g., Spencer-O'Neill House, Inc. v. Denbeck,* 196 Neb. 456, 243 N.W.2d 767 (1976); *Ely Construction Co. v. S & S Corp.,* 184 Neb. 59, 165 N.W.2d 562 (1969).[5] *See generally* 17 Am.Jur.2d Contracts § 244 (1964); 17A C.J.S. Contracts § 295 (1963). An examination of the record in this case convinces us that Judge Denney's conclusions (1) that the transfer of 54.9% of the stock to a voting trust constitutes transfer of "any controlling interest in the ownership" of Western Securities and (2) that the execution of the Voting Trust Agreement and the Buy-Sell Agreement by the Johnson and Rasmussen groups constitutes the type of event which the parties intended should give rise to National Reserve's power to terminate the agreement, are well supported by the record.

Strong evidence of intention is found in the testimony of the two men who entered

---

**5.** We apply Nebraska law in this diversity case.

into the contract on behalf of their respective companies. Laybourn of National Reserve, who drafted the contract, testified that this clause was included "because if there was any change of any kind in the correspondent, I wanted to be able to take some kind of action." He also testified that the adjective "any" before "controlling interest," which seems to imply that there can be multiple forms of controlling interest, was "put in there so it couldn't be construed as stock." Spelman, who accepted the contract for Western Securities, in testifying as to his understanding of the meaning of the contract in 1964 when it was executed, stated, "I feel that this [clause] means that the contract could be cancelled by National Reserve Life Insurance Company if there was any transfer of ownership that resulted in a change of the personal relationships which were then in existence."

This interpretation is fully consistent with the nature of the mortgage banking industry. Both men testified that mortgage banking transactions are built upon a very personal relationship between the investor and the correspondent. Laybourn testified that the character and reliability of the correspondent are very important to investors. Spelman described this as a "fragile relationship." Robert Pease, the president of a mortgage banking correspondent and a witness on behalf of National Reserve, testified that the business relationship in the mortgage banking area is "one of the most direct and personal business relationships that I have ever known," and that the trust that is necessary in these transactions is "not in a group of thirty people" but "mainly [in] one individual, the man who is running the mortgage operation."

In addition, Pease testified that it was the custom and practice of the mortgage banking industry to include a termination clause in a servicing contract, and that

words of the nature of those in question in this case are commonly understood to refer to changes in management. Although there was conflicting testimony on this point, and the District Court found the evidence pertaining to a trade custom or usage "unpersuasive," this testimony does underscore the fact that the interpretation given the language by the two principals involved in its execution is reasonable.

We conclude that the intent of the parties in using this language at the time the contract was executed was to protect National Reserve from changes in policy due to changes in personnel of the type brought on by the events of this case, without concern over such technical matters as who held legal ownership of the stock certificates and who received the dividends from the stock. We therefore hold that the District Court was correct in finding that the termination was one for cause.[6]

Affirmed.

---

6. The appellants present us with an elaborate argument discussing the different aspects of a transfer of stock to a voting trust, dissecting the transaction into its various technical and beneficial components. Because we have concluded that the clear intent of the parties was to allow termination upon the occurrence of events such as those here, we find it unnecessary to expound upon the metaphysical characteristics of a transfer of stock to a voting trust.