# TOWN OF MILFORD
*vs.*
## O'NEIL BROS., INC. ET AL.

Superior Court      New Haven County      File No. 56798·

MEMORANDUM FILED JULY 22, 1940.

*Beers & Beers,* of New Haven, for the Plaintiffs.

*John J. Collins* and *Farrel J. LeRoy,* of Hartford, for the Defendants.

CORNELL, J.   Prior to December 21, 1935, the plaintiff (hereinafter referred to as the "town") determined to con-struct a portion of a system of sanitary sewers in its central area and on the latter date the defendant, O'Neil Bros., Inc. (hereinafter designated the "contractor") executed a writing known as Contract B-1 to build and lay sanitary sewer lines in the following streets: North Street, Plymouth Place, Pros-pect Street, River Street, West River Street, Daniel Street, Factory Place and a small section of New Haven Avenue; also, an inverted syphon crossing the Wepawaug River just north of the lower dam.   On April 15, 1936, the contractor and the town executed another agreement known as Contract B-2 whereby the contractor undertook to build sanitary sewers constituting the remainder of the program, in the following streets and locations: Noble Avenue, Reed Street, Seaside Avenue, North Broad Street, South Broad Street, Golden Hill Street, Central Avenue, Greene Street, Union Street; harbor side section with George and Elton Streets, together with a line known as a private right of way consisting of a reinforced concrete pipe running approximately from New Haven Avenue to a pumping station and an eight-inch force main from the pumping station to the sewage disposal plant.   In all, inclu-sive of risers or chimneys, the total length of pipe to be laid under both contracts was about six and thirty-eight one hun-dredths miles.

In the early part of January, 1936, the contractor com-menced the performance of Contract B-1 and immediately fol-lowing April, 1936, did likewise with respect to the project described in Contract B-2.   From the respective dates on which work was begun under each, it progressed continuously (with the exception of certain interruptions alleged in the contractor's second and third counterclaims) until early in June, 1937.   At the latter time the work described in both contracts was completed with the exception of certain com-paratively minor details, *e.g.,* smoothing highways at trench sites, cleaning out sewer pipes and manholes, etc.   In the in-

stant action, the town claims damages against the contractor as principal and the defendant, The London & Lancashire Indemnity Company of America, as surety, upon performance bonds executed and delivered to the town as was required in each of the contracts. The basis of this claim is that the contractor breached both agreements in three respects, viz.: (1) in that, upon completion, the sewer system built under each, infiltrated in excess of the quantities named in each of the contracts; (2) that the contractor has failed to properly perform the work of backfilling the trenches; and (3) a large number of manhole seats and covers do not conform to the specifications.

The most important aspect of the controversy is that which relates to the alleged failure on the contractor's part to construct the sewer lines so that they would not infiltrate in excess of the maximum daily quantities prescribed in the specifications. The pertinent provisions relating to this subject are: the same in both agreements and occur in section 1:21 of Contract B-1, and section 1:34 of Contract B-2. They read as follows: "The pipe lines will be tested by measuring the infiltration. These tests will be made by the engineer on sections of the pipe lines or on the entire system as he may elect. The amount of infiltration so measured by the engineer shall not exceed the rate of ten thousand gallons per mile on any two hundred feet sections of the sewers in twenty-four hours.

"If the flow of the ground water on tests exceeds the amount specified above, the contractor shall excavate and uncover such portions of the pipe lines, manholes, etc., as give indication of leakage and shall repair or rebuild those portions in full accordance with these specifications. Such repairing and replacing shall be carried on until the complete system meets the requirements for tightness specified above. The contractor shall furnish the engineer with necessary assistance in making the tests and shall include all such costs in the price bid for the completed work. All repairs or reconstruction necessary to meet the requirements of the tests shall be made at the contractor's own expense."

The function of the combined systems is to collect sanitary sewage in the areas serviced by them and conduct it by gravity to a pumping station built by another contractor, from which point it is forced through a main to a disposal plant also erected by a different concern than the contractor's. As orig-

inally designed, the pumping station was to be equipped with two electric pumps, each capable of pumping 400 gallons of fluid per minute, but this was later changed so that there were installed, instead, two electric pumps capable of pumping 600 gallons per minute, but in practice operated alternately. The term "infiltration" as used in the quoted paragraph of the specifications means water which gains entrance to the pipe lines from sources exterior to them. The importance of avoiding an excessive amount of this is to obviate placing an unnecessary load upon the pumps, thereby increasing the cost of operation of the pumping plant. The latter is equipped with a device called a Venturi meter which measures the flow of liquid coming to the pumping station from the system.

During July, August and September, 1937, a firm other than the contractor's installed 361 house laterals, i.e., pipes connected onto the risers on top of the sewer lines and of the same material and running thence to the curb lines, at which point property owners could connect with buildings on their premises. On September 1-2, 1937, at which time the Venturi meter was operating, the resident engineer made a test at certain points to determine the extent of infiltration in the system. At one place which covered lines 3,950 feet in length it was then indicated that the maximum flow was excessive by a very great percentage. This, the resident engineer attributed to leakage in the pipe lines. The condition was brought to the contractor's attention and the request made of him that he cause certain repairs to be effected, on North Street, the precise character of which does not appear. However, nothing was done in response to the resident engineer's demands by the contractor up to October 11, 1937.

On the latter date the resident engineer made other tests at two different points which, also, yielded evidence of heavily excessive flow. Following November 16, 1937, the contractor's president came to Milford in response to a letter written him on that date by the resident engineer and put a force of men to work at places indicated by the resident engineer, as well as at other locations where it was considered that measures might be taken to reduce the assumed leakage. However, both the resident engineer's and contractor's efforts were unavailing because the Venturi meter at the pumping station in a reading taken about the middle of November, 1937, showed similar excessive flow, while an observation made about December 21,.

1937, pointed to an increase rather than a diminution of it.

Between that date and February 8, 1938, the contractor at the insistence of the resident engineer sent men at intervals to make repairs at various points as directed by the resident engineer, but whatever the nature of such work may have been, it seems evident that it had little, if· any, effect in re-ducing the volume of liquid reaching the pumping station, which further Venturi meter readings made in the early part of February indicated to be 252,000 gallons of fluid per day, of which only about 10,000 gallons per day was sewage and about 65,000 allowable infiltration. At about this time the board of sewer commissioners of the town brought the matter to the attention of the consulting engineers. After further work by the contractor, the Venturi chart on April 6, 1938, confirmed the purport of its previous recordings.

In an endeavor to locate the cause of the excess liquid flow-ing through the system to the pumping station the board of sewer commissioners retained Mr. Allen Beardsley, an engineer with a long and wide experience in sewer construction, to make a special investigation. Mr. Beardsley entered upon the performance of this task about December 8, 1938. On December 29, 1938, he made a preliminary report of his findings which was supplemented with a second on March 23, 1939, and followed by various other tests between that time and up to and during May, 1940. The methods used by Mr. Beardsley, except for some qualifications of no decisive im-portance, are generally approved by all the other engineers who have testified. The only serious questions of the validity or conclusiveness of the results have to do not so much with the fact that these establish the presence of infiltration far in excess of that permitted in the specifications but with the cause of it and the responsibility for it. In general, it is con-tended in behalf of the contractor that the condition is ac-counted for, not so much by leakage into the system as it is by the induction of storm waters directly within the lines through connected roof leaders, together with ground water through old drains, notably from such premises and the build-ings thereon as Lauralton Hall, Weylister School and the Milford High School. In so far as storm waters (i.e., as col-lected from roofs, etc., and conducted through roof leaders to within the sewer lines) are concerned, it appears that the effect of this factor practically disappears in about a half a day

after rainfall ceases. Certain tests made eliminate that factor as an ingredient of the conclusions arrived at. Making liberal allowance for the introduction of ground waters through the old drains on the premises mentioned, together with other factors of less importance, it is the conclusion that the plaintiff has established the fact that due to leakage in the system, ground waters infiltrate within it to an amount far in excess of that permitted under the provisions of the specifications quoted *supra*. The evidence further demonstrates that certain parts of the system where the pipes are above ground water levels are immune from this condition. The sections where the infiltration occurs are: Prospect Street, Plymouth Place, and North Street between station 2—47 to station 30—38; Daniel Street, River Street and West River Street from station 20—28 to station 35—36.25; Reed Street and Noble Avenue, from station 2—24 to station 16—47.1 and a line laid in a private way between station 17—78.05 to station 19—56.48. Generally speaking, all these are below ground water level and either in deep rock cut or their flow lines are below the surface of the Wepawaug River near which they are located.

In view of the finding that the systems constructed under the contracts infiltrate to a very material extent beyond the amounts stipulated in the specifications, there is presented the question whether the contractor is legally at fault for such condition and is to answer in damages under the allegations which appear in the complaint. The broad theory underlying the town's claimed right to recover, as the complaint describes it and as counsel contend, is that the contractor's undertaking under both contracts was to build a system of sewers under each which would not infiltrate in excess of the amounts stated in the specifications. Such an engagement, obviously would comprehend (1) that the design of the systems was both sufficient and correct to accomplish the purpose, and (2) that the materials used by the contractor would be those specified and the work required in drawings and specifications performed as therein required and in a workmanlike manner. Concern is presently had here with the first of these propositions only.

Since the drawings and specifications were prepared by the town's resident engineer and approved by its consulting engineer and the contractor had no voice, whatever, in what

they contain, it is obvious that the only theory upon which it could be held that the contractor could have undertaken any responsibility with respect to them, would be that he warranted their sufficiency to achieve the sought for result and that they were free from defects which would militate against such an attainment. An engagement of this character on the contractor's part would have to appear either as the effect of express provision in the contracts or, lacking that, as a necessary implication from the terms which are stated in them.

Obviously, there is no provision in either of the contracts in which any such undertaking as respects the drawings and specifications is described. The only express warranties under that terminology which appear in either contract are identical in paragraph 23 of each. The only statement in these having even a remote tendency in that direction is that: "The Contractor represents and warrants.... (d) that he has carefully examined the plans, the specifications and the site of the work, and that, from his own investigations he has satisfied himself as to the nature and location of the work, the character, quality and quantity of surface and sub-surface materials likely to be encountered, the character of equipment and other facilities needed for the performance of the work, the general and local conditions and all other materials which may in any way affect the work on its performance." Patently, the content of this provision lacks that elasticity which would be needed to twist it into a resemblance to an express warranty of the character in question. In the absence of any other and, particularly, in view of the fact that the contract read as a whole displays no such intention, it is the conclusion that there was no express contractual intent that the contractor warrant the sufficiency of the plans and specifications.

The remaining question is: Do the provisions of the contracts imply a warranty on the part of the contractor that the drawings and specifications, if the work were performed with fidelity to them, would be sufficient to produce sewer systems which would not infiltrate in excess of the specified amount and free from errors or defects which would interfere with the achievement of that result? The justification for such an implication, if it exists, must be found in its relationship to the thing which the contractor agreed to do. This, for example, was not to construct systems of sewers of a prescribed capacity in specified locations as a collection agency and to

deliver the flow to a pumping station with a discretion corre-sponding to the successful attainment of such an objective concerning the sizes of pipe, the materials of which it should be composed, the manner in which the several sections should be joined together, the levels and elevations and the many other factors which would have to be taken into account in such a project. On the contrary, reduced to its elements, all that the contractor undertook to do was to furnish the required pipe of the various sizes named, made of the ma-terial and of the quality stipulated, lay it in the locations designated, join it together in the manner and with the ma-terials described, place and build manholes and other parts and appurtenances made of the materials enjoined, excavate for the trenches in which' such lines were to lay, and as this was done backfill them and restore the pavement which had been broken in the operation. True, the purpose in all this was a resultant system of sewers, but strictly speaking that and the success of its functioning as such, were the problems of the design and not the concern of the contractor. The latter's employment was one, in essence, only to furnish ma-terials of certain kinds, and the labor to put them together as he was required by the drawings, specifications and direc-tions of the resident engineer to do, and to perform it all in a workmanlike manner. Far from having the right to use his own judgment even where his experience of some 40 years in that kind of work would have led him otherwise to depart from the plans or specifications, he was prohibited by the ex-press terms of the contract from so doing. Quite the con-trary, the agreements exacted of him the strictest compliance with the plans and specifications and the orders of the engineer and left him no opportunity to exercise his own discretion in the minutest detail. "In order that an unexpressed term may be implied the implication must arise from the language em-ployed in the instrument or be indispensable to effectuate the intention of the parties....and courts will be careful not to imply a term where the contract is intentionally silent, or which is against the intention of the parties as gathered from the whole of the instrument." 13 C.J. Contracts §5210. See, also, McGarrigle vs. Green, 76 Conn. 398, 404. More-over, the only sanction for an implication of a promise in a written contract is that without it the contractual intention will be frustrated—that it is necessary to effectuate the intent of the parties as disclosed in the writing. Lakitsch vs. Brand,

99 Conn. 388, 394; *First Ecclesiastical Society vs. Besse,* 98 id. 616, 623. *See, also, Rockwell vs. New Departure Mfg. Co.,* 102 id. 255. Obviously, the nature of the contractor's under-taking being as defined *supra,* whether the design of the sewer was proper or faulty was not a determination which played any part in the discharge of it. Hence, there is no occasion for the implication of such a warranty.

In the absence of such an express contractual intention and in the lack of any express warranty or basis for the implica-tion of one that the contractor engaged to construct sewer systems such that if built according to the drawings and speci-fications would not infiltrate beyond the specified limits, the conclusion is that the contractor sustained no obligation with respect to the operation or functioning of the sewers when complete and that his sole undertaking was to furnish the materials and labor with which to construct the sewer and the equipment, apparatus and tools required to enable him to do so, in accordance with the drawings and specifications and the orders and directions of the resident engineer. This determ-ination, it is believed, is sanctioned by the preponderance of authority. The general rule is stated in 9 C.J. Building and Construction Contracts §81, as follows: "Where the contract contains a guaranty or warranty, express or implied, that the builder's work will be sufficient for a particular purpose or to accomplish a certain result. . . . the risk of accomplishing such purpose or result is on the builder, and there is no substantial performance unless the work is sufficient for such purpose or accomplishes such result. But where he agrees to build ac-cording to certain specifications and guarantees the sufficiency of the work he is not required to do more than the specifica-tions call for, and there is no implied agreement on the part of the contractor that the work when completed, according to plans and specifications, will be safe and fit for the purposes intended. . . ." The rationale of this statement has been ap-plied in *State vs. Commercial Casualty Ins. Co.,* 125 Neb. 43, 248 N.W. 807, 88 A.L.R. 790; *Friederick vs. County of Red-wood,* 153 Minn. 450, 190 N.W. 801, 802; *Reinhart Constr. Co. vs. Baltimore,* 157 Md. 420, 146 Atl. 577, 578; *Murphy vs. Kassis,* 59 N.D. 35, 228 N.W. 449; *Southgate vs. Sanford & Brooks Co.,* 147 Va. 554, 137 S.E. 485, 488; *Fritz vs. Wol-denberg,* 199 Wis. 99, 225 N.W. 700; *Canuso vs. Philadelphia,* 326 Pa. 302, 309; *Filbert vs. Philadelphia,* 181 Pa. 530, 37 Atl. 545, 546; *Harlow & Co. vs. Borough of Homestead,* 194 Pa. 57,

45 Atl. 87; *Bancroft vs. San Francisco Tool Co.,* 120 Cal. 228, 52 Pac. 496, 498; *Conway Co. vs. City of Chicago,* 274 Ill. 369, 375, 378; *Clark vs. Pope,* 70 id. 128, 132; *Fairman vs. Ford,* 70 Vt. 111, 39 Atl. 748; *MacKnight Flintic Stone Co. vs. Mayor, etc., of City of N. Y.,* 160 N.Y. 72, 54 N.E. 661, 663, 664; *Bush vs. Jones,* 144 Fed. 942, 943. *See, also,* annotation in 88 A.L.R. 797. In *Hills vs. Farmington,* 70 Conn. 450, the opinion is really concerned with the admissibility of certain parol evidence designed to establish an express warranty, the effect of which would vary the terms of a written agreement to construct a building according to plans and specifications prepared by an architect, which contract contained no "warranty of the architect's plan." While there was no definite expression respecting the rule here discussed, by implication, it is evident that occasion was not taken to dispute it.

The definite holding in the instant case is that as a matter of law, in view of the provisions of the contracts (inclusive of the drawings, specifications and addenda), the existence of excessive infiltration does not constitute a breach of the contractor's undertaking and that liability can be imposed upon it only if it be established that the materials furnished or the method of doing the work did not meet the requirements of the drawings and specifications or in some material way departed from the proper orders of the engineer having supervision and direction or, satisfying the demands of plans and specifications, yet was not performed in a workmanlike manner. This latter poses a question of fact as do the claims that the backfilling of trenches was not properly done and that the manhole covers and seats did not accord with the specifications. These matters are considered below. Before examining them it is necessary to dispose of certain special defenses which both defendants have filed, since these, in part, at least, essay to prevent recovery on that basis because, *inter alia,* it is contended that the right to it has been waived.

The first special defense is ineffectual, both factually and legally. It is directed to the town's right to recover because of alleged breaches of contracts due to the excessive infiltration. In it it is stated that after the work had been substantially completed in early June, 1937, but before any test for leakage had been made, the resident engineer at the behest of the board of sewer commissioners on or about July 13, 1937, requested permission of the contractor to connect to the sewer

lines installed by the latter through another contractor, some 361 house laterals, and upon the refusal of the contractor to comply in the absence of a test of the lines, such house laterals were, nevertheless, against the protests of the contractor, installed. On the evidence the contractor maintains that the disturbance of the earth incident to the excavation and, particularly, blasting in close proximity to the sewer lines, was a likely cause of admission of ground water to the backfilled trenches where the sewers lay and, at least, augmented the pressure of waters about the joints and so had a tendency to increase any normal amount of leakage; likewise, that it was likely that risers on the upper sides of the pipes had been broken when blasting occurred and were a prolific source of the entrance of ground water. However, the evidence demonstrates that contrary to the allegations of this defense, the contractor, in writing, not only gave his consent to the connection of such house laterals, but expressly waived "any claim of acceptance of our work on the ground of hooking up said laterals." Even, however, had the town by the conduct alleged waived the right to test the systems for infiltration and though its acts in so doing could be said to be an acceptance of the contractor's work, as is claimed in and under this defense, still that would not absolve the contractor from liability to answer in damages for defects caused by deficiencies of quality of material or workmanship "appearing within a period of one year from the date of substantial completion" under the provisions of paragraph 29 of Contract B-1, or for its failure to satisfy the provisions of the guaranty in paragraph 51 of Contract B-2 during its operative period, viz., "a period of six months from and after the date upon which the final estimate of the engineer is made and signed."

The contractor's second and fourth special defenses (which are the second and fifth defenses of defendant, The London & Lancashire Indemnity Co. of America) allege two courses of conduct upon the part of the resident engineer and the board of sewer commissioners by reason of which it is asserted the town "thereby discharged" the contractor "from any obligation to the plaintiff on its contracts....arising out of the causes of action alleged." In the sense that each breach of each contract recited is a cause of action, the complaint is broad enough to comprehend (in addition to those concerned with improper backfilling and defective manhole seats and covers) a claim that the contractor failed to construct sewer

systems that would not, on test, infiltrate in excess of the amounts limited and that this occurred either (1) because of a defective design, the sufficiency of which he had warranted, or (2) by reason of improper material or inferior workmanship, or (3) both; and (4) a failure on its part to observe the requirements of paragraph 29 of Contract B-1 and paragraph 51 of Contract B-2, in the former of which the contractor agreed to repair any defects which appeared and in the latter of which it guaranteed its work and the materials furnished, during the period specified in each. For either of such defenses to be completely effective, if the allegations contained in them are found established, to "discharge the defendant from all liability arising out of the causes of action alleged in the complaint" the factual content of either of them must be such as to furnish a complete defense to each and all of such causes of action. To attribute to the word "discharge" as it appears in the last paragraph of each, its technical significance as connotative of one of the means of terminating a contractual relationship, would nullify the purpose of these defenses, since acceptance of the work done in performance of a contract does not necessarily have that effect. The defense evidently intended to be pleaded is waiver of complete performance arising from acceptance, which is quite a different thing than discharge of liability following failure to, or to adequately perform. However, counsel for all parties have treated the matter contained in both defenses as alleging waiver and it will be so viewed here.

In the second special defense, the alleged acceptance and consequent waiver is made to depend upon three specific facts which in substance are: On September 11, October 11 and November 11, 1937, the town's resident engineer subjected the sewers to tests for infiltration; as a result of them he expressed his satisfaction with the construction of the sewer lines and stated that they met the requirements of the specifications; and on November 23, 1937, the board of sewer commissioners upon his recommendation accepted the sewers as in conformity with the contracts.

The only action taken on or about November 23, 1937, in behalf of the board of sewer commissioners by the resident engineer was the execution of two certificates, one applying to the work done under Contract B-1 and the other to that performed under Contract B-2, each stating that the work

had been " 'entirely *completed'*, in accordance with the approved plans, specifications, contract documents and change orders." On the same date, the board of sewer commissioners also caused a "Certificate of Completion" to be executed in its behalf by its secretary, of the same purport. These were filed with the state director of the Public Works Administration. Their purpose was to enable that agency to make final payment to the Town of Milford of the balance owing on each of the contracts, concerning which the resident engineer had expressed anxiety in a letter urging the contractor to speedily make repairs written on October 7, 1937, because he had been informed that the office in Connecticut would be closed "after November 1, 1937."

Obviously, by their terms, these certifications make manifest that the work called for had been "completed", but do not say that as between the town and the contractor it had been accepted. The conduct of the resident · engineer in merely stating in conversation that he was satisfied, if the proof sustained that allegation, with the results of the tests concerning infiltration, and the filing of certificates of the character described for the purpose mentioned with the director of the Public Works Administration do not either as isolated acts or in combination, alone, establish that the town accepted the sewer systems on November 23, 1937, as between it and the contractor any more than would the making of a final payment and the entering into occupancy of a house by an owner erected for the latter by a contractor. *Burr vs. Ellis,* 91 Conn. 657, 660. The significance of such conduct can be revealed only by considering it in the light of the circumstances under which it was pursued. *Burr vs. Ellis, supra,* 660; *Pratt vs. Dunlap,* 85 Conn. 180, 185; *Flannery vs. Rohrmayer,* 46 id. 558, 560. Among the circumstances prevailing at the time the certificates in question were made and filed were these: Several weeks prior to September 28, 1937, the resident engineer had pointed out certain repairs which he requested the contractor to make and on that date wrote the latter, calling his attention to the fact that he had not attended to the matter and stating that the omission was delaying "final payment of the grant"; again on October 7, 1937, he chided the contractor that the latter had not made "the necessary repairs on North Street and the other things that must be done to complete the job", and informing him that he would like to have

the final estimate cleaned up before "the state office of the Public Works Administration was closed" after November 1. On November 16, 1937, a letter from the resident engineer to the contractor recalled a phone conversation between them "last week" relative to the amount of leakage in the sewers and saying that its president "had been expected down on November 15" to look into the matter. In this communication the resident engineer stated: "I do not feel that I can sign the certificate of acceptance for these contracts when the leakage so far exceeds what was called for", and that though the town was ready to make connections to the sewers and start the plant running this would not be done until the matters referred to were taken care of. Following the filing of the final estimates and the certificates of completion, the "infiltration" as measured at the pumping station showed an increase over what it was "a month ago", as stated in a letter written on December 21, 1937, by the resident engineer to the contractor in which it was said that the latter had been expected down to "go over the sewer lines and see what can be done." Without reciting additional detail, it is apparent that at the time that the events narrated in the second special defense occurred, the resident engineer was earnestly and consistently urging the contractor to make repairs and complete the work in default of and until the accomplishment of which it is evident that he did not consider that the town would be justified in accepting the sewer systems. These circumstances rob the events detailed in the second special defense of the significance which the contractor claims for them and require the finding that the contractor and defendant surety company have failed to sustain the burden of proof concerning them. *Burr vs. Ellis; Pratt vs. Dunlap; Flannery vs. Rohrmayer,* all *supra.*

However, under the allegations of the fourth defense (which is the surety company's fifth defense) the contractor has established that the town did accept the sewer systems constructed under each of the contracts at or about June 8, 1938, under such circumstances as to ordinarily indicate an intention to waive any defects either of design, materials or workmanship. In this defense it is alleged that further tests were made about April 13, 1938; on June 8, 1938, final payment was made to the contractor representing a balance due him on Contract B-1 and about that time the board of sewer commissioners author-

ized property owners to connect into the systems. Among the circumstances in the light of which it is concluded that the facts alleged constituted an acceptance and waiver, are these: In response to the continued complaints of the board of building commissioners and the urgings of the resident engineer, the contractor furnished men from time to time during the late fall to do such work as the resident engineer suggested and as the president of the contracting corporation deemed practicable to diminish the excess flow. All of these efforts were unsuccessful. Early in February, 1938, the board of building commissioners enlisted the advice of the consulting engineers who had designed the pumping and sewage disposal plants and approved the drawings and specifications under which the sewer systems were built. Under the direction of the latter, further tests and additional recommendations for repairs were made. The latter were performed, but it is found were ineffective to materially correct the condition. Together with the facts recited, a persuasive circumstance in reaching the determination stated *supra* is that, notwithstanding the fact that the infiltration is excessive as fixed by provisions of the specifications, nevertheless, the total average daily flow is well within the capacity of the system and the pumping and disposal plant and both the collection system and the pumping and disposal plant are presently amply able to care for the needs for which they were designed. The sizes of the present sewers are sufficient even with the excessive infiltration to care for future extensions and use for 25 years provided care in future design and construction limits the leakage to not exceeding 10,000 gallons per mile per day and Milford continues to grow at no greater rate than it has during the past ten years. The consulting engineers laid stress upon some of these facts when on April 13, 1938, they recommended that when certain work which they designated was performed (and which was later done) by the contractor "that the sewers built under the two contracts....be accepted....and that house connections be made and put into service as promptly as possible."

The town urges that because as found *supra* the infiltration in the sewer lines constructed under both contracts was so heavily in excess of that allowed by the specifications, the engineer's recommendation that the work performed under both be accepted was palpably in disregard of the plain terms of the contract and so furnished no sanction for the acceptance

made in reliance upon it by the board of building commissioners under the ruling made in *Clover Mfg. Co. vs. Austin Co.*, 101 Conn. 208, 213, 214. That, however, could only be so if (a) the contractor's engagement was to build systems of sewers that would not when completed leak beyond the prescribed limits or (b) the materials used and work done by him did not conform to the requirements of the specifications or were otherwise defective. The first of these has been decided *supra* and it has been held that the contractor engaged only to furnish the materials and do the work required in a workmanlike manner according to the drawings and specifications. Only if it may be found that the contractor failed in this respect can it be concluded that he breached the contract; that the conditions produced by such breach are responsible for the excess infiltration and that the engineer knowing or being presumed to know this was guilty of bad faith as that term is defined in the opinion in *Clover Mfg. Co. vs. Austin Co.*, *supra*, in recommending acceptance of the systems.

As previously observed, the allegations of the complaint are sufficient to encompass a claim that the excessive leakage was caused by the contractor's default in the respects mentioned, notwithstanding the principal theory revealed in them and the insistence upon contentions arising therefrom. Such claim is considered at this point in connection with the kindred contention that the engineer's recommendation to the board of building commissioners on April 13, 1938, that the work done under both contracts be accepted, was in bad faith. However, the town has produced no direct evidence in support of the claim that defective materials or workmanship furnished by the contractor is the responsible cause of the leakage, and its counsel admitted during the trial that none was available. In this situation, the town depends for proof of its contention upon an inference which it maintains is an unavoidable one. It urges that since the systems leak to so great an extent by comparison with the allowable tolerances named in the specifications it necessarily follows that because the contractor did the work throughout, it is at fault. Of course, this ignores the fact that more than one cause may account for the presence of the condition, among them, insufficiency or defect in design. To infuse validity into the town's contention, therefore, it would be indispensable that there be evidence, at least, tending to distinguish defective materials or

workmanship as the more probable of such agencies. Quite the contrary, however, the evidence points away from rather than toward faulty materials or workmanship as responsible for the condition.

As pointed out *supra* the sections of the sewer lines which leak excessively are all either in deep rock cut, or are located in close proximity to the Wepawaug River and their flow lines are below the surface of it, or in shifting silty soil. All are below the ground water table and in some places there is evidence of the presence of subterranean streams, the flow of which was intercepted by the excavations for the sewer trenches and manholes. In these areas as in the portions of the systems which are laid above ground water level and show no infiltration, the pipes, in various sizes, are all of vitrified tile in three-foot lengths. These in themselves are impregnable to the admission of water but to make a line have to be joined together. In the systems constructed under both contracts, there are in all approximately 10,000 joints. While water may leak into the lines from other causes (*e.g.* defective manholes, improperly made and sealed connections of house laterals to the risers on the top of the sewer lines, injury to the pipes or breaking into them to connect with them in places other than at the risers, etc., etc.), the weak points are the joints. These are made with a bituminous material which must be poured in a particular manner. Subject to no torsion in the trenches and immune from too great ground water pressure they will last indefinitely. Theoretically they are watertight, but as a matter of experience they are apt to leak to some degree under ordinary conditions and this propensity increases according to the pressure of ground water upon and about them. Again, once the line is made, it must be held reasonably rigid since sufficient torsion caused by a shifting of level of any of the joined units exerts a tendency to part the joints or, at least, to make holes which in themselves will admit ground water which in turn if of sufficient volume and pressure will enlarge and increase the amount of water flowing into the pipes.

Without particularizing, the conditions encountered in building the sewer lines where the infiltration is great were such as placed a heavy tax upon the joints. In some places the rock cut was 20 feet deep. The rock itself was of such a quality that when blasted it shattered "way back" from the ordinary

trench lines. In one place this condition required the removal of about six times the quantity more than ordinarily. The intact rock to the sides then contained cracks and fissures which made natural courses for ground water to flow into the trenches. So great was the amount of such water in places that the underdrains beneath where the pipes were placed were required to be enlarged so that the work could continue. In some of these instances, the contractor recommended that cast iron pipe be substituted. This comes in greater lengths than the vitrified tile pipe and so requires a less number of joints. Moreover, the joints may be more effectively sealed, thereby reducing the opportunity of ground water to enter the system. In another location silty soil was met with and the contractor suggested that piling be used for support. The underdrains had no outlets and the contractor endeavored to obtain permission to supply them. This was refused. Had it been granted it would have had afforded means for water seeping or flowing into the closed trenches to have run off, thus reducing the pressure on the joints and the leakage into the pipes. In the instance of certain manholes of considerable depth the contractor at his own expense built the walls more thickly than the specifications required. With the exception of the fact that in one case, at least, where the contractor's recommendation that iron pipe be substituted was not fol- lowed and he was allowed to use concrete cradles, practically none of the contractor's suggestions were carried out although a wealth of testimony from expert engineers attests their soundness.

Throughout, the work was under the supervision of the resident engineer and his assistant. In addition, inspectors appointed by the board of sewer commissioners were on the job daily. The joints were poured by men especially skilled in that kind of work brought to the scene for the purpose. In no single instance was exception taken to the manner in which this work was performed. In fairness to the resident engineer it should be noted that he was attentive to the con- ditions encountered and apparently anxious to make changes in the drawings and specifications to meet them as they occurred. Apparently, the town was either unable or un- willing to assume the additional outlay which this would have entailed. At any rate, this partial resume of the manner in which the contractor performed its work leaves nothing upon

which to base the inference which the town asks be drawn. It is the conclusion that the town has failed to establish that the cause of the excessive infiltration was either defective materials furnished or faulty workmanship performed by the contractor and that the action of the engineer in recommending the acceptance of the systems constructed under each of the contracts was free from bad faith. It follows that if, contrary to the conclusion reached *supra,* the contractor was required to build and complete sewer systems that would not infiltrate beyond the limits fixed in the specifications, any default on its part in that respect was waived by the town when the work was accepted by it, and that the contractor thereafter may be held legally accountable as he is in any event, only for failure to perform the duty imposed in paragraph 29 of Contract B-1 and paragraph 51 of Contract B-2, which is limited to defects arising from improper materials or workmanship and such only.

Incidentally, had the point been raised there would be grave doubt whether the provisions of the first paragraph of sections 1:21 of Contract B-1 and 1:34 of Contract B-2 which prescribe the leakage test is valid in the limits which it fixes. Those parts of the sections named which purport to impose the duty upon the contractor, if the sewers are found to infiltrate on test in excess of the amounts stated, to "rebuild those portions" which "give indication of leakage", etc., are not binding on the contractor under the construction given the contracts *supra,* because as they stand they inflict an obligation on it which exceeds that described in the contracts and is hence inconsistent with the contractual intent. *Cruthers vs. Donahue,* 85 Conn. 629, 631.

Among the other claimed breaches of the contracts on the contractor's part is one concerning which it is alleged that the contractor failed to perform the work of backfilling the sewer trenches in a proper and workmanlike manner. As a result, it is asserted that certain of the highways have sunk at such sites. Because of this, it is averred the town found it necessary to place "cold patches" over such areas at a total cost of $804 and, due to further sinkings in others of its streets from the same cause (viz., Winthrop Court and Seaside Avenue) it will be necessary to make additional repairs of similar character, the reasonable cost of which will be $262.

There is credible evidence that notwithstanding the utmost care and skill the unavoidable bulking of disturbed earth will cause depressions or holes to form at the surface, which tendency under comparatively normal conditions is likely to persist over a period of about two years following the refilling. Counsel for the town concedes "that in the nature of things some settlement of the backfill would be anticipated no matter how careful the contractor's employees were."

The only proof offered in support of the claim made is a description of the existence of the condition and of the fact that in part it has necessitated repairs and in part will require further attention. But, as noted, the mere presence of such sinkings is equally compatible with results occurring despite the utmost care in the performance of the work of backfilling as it is with the fact that such work was negligently or unskillfully done. To justify a judgment on the basis of the claim made, it was, of course, incumbent upon the plaintiff to produce evidence at least indicating a reasonable probability that the reason for such sinkings was a failure to do the work in a workmanlike manner. This has not been done. It is found that the plaintiff has failed to sustain the burden of proof of the allegations in question.

The third manner in which the town alleges that the contractor breached the contract concerns the seats and covers for manholes furnished. The specifications require that these shall be "machined to true plane surface." In all 251 of them were supplied and installed, but of this number 119 were not machined as specified. It appears that both machined and unmachined are in general use. The one performs the function for which it is designed as well as the other. The only advantage which the machined surface seats and covers possess over those not so finished is that the covers fit more evenly and snugly upon the flange of the frame which holds them and so are less likely to move when traffic passes over them. However, if grit or pebbles, as often happens, gets in between the seat and the cover they are likely to be noisy. On the other hand if asphalt paint which lasts indefinitely is applied to the unmachined seats and covers this fills in the rougher surfaces to a large extent and has a tendency to produce a snug fit and in that case to make little or no noise other than occasionally a rattle, although if there chances to be nubs upon one or the other this will cause the seat to move when

vehicles pass over them, which in turn will produce noises. Undoubtedly, the substitution of the unmachined for the planed surfaced seats and covers was a departure from the strict requirements of the specifications, but it is found that this was not done willfully by the contractor. However, it does not appear how many of the 119 really make noises in use, although a number of them do. In so far as the plaintiff claims a right of recovery because, as it is alleged, a nuisance has been produced, the sufficient answer is that there is neither allegation nor proof that it has been subjected to any liability on that account.

The applicable rule of damages under the facts detailed is tersely stated in Restatement, Contracts, §346, comment on subsec. (1a). The authorities in Connecticut are in accord with it. *Raff Co. vs. Murphy,* 110 Conn. 234; *Daly & Sons vs. New Haven Hotel Co.,* 91 id. 280; *Pinches vs. Swedish Lutheran Church,* 55 id. 183, 187. It need not be quoted here.

Suffice it to say, that the only evidence produced by the town to show what damage it has suffered as a result of the departure is based upon demolishing sufficient of the manhole structures into which the seats or frames fit, then rebuilding them with planed surfaced seats or flanges, in addition to the current cost of the machined seats and covers with no salvage value except as junk for those now in use. This is so out of proportion to the detriment suffered by the town due to the substitution as to be inequitable. There is, however, no evidence to enable the court to ascertain the amount of damages on the other basis which the authorities cited *supra* sanction. In this situation the town would be entitled to nominal damages only which would probably be about $35.

The situation is saved, however, by the claim of the contractor that the resident engineer accepted the seats and covers as furnished by the contractor on the latter's agreement to fit pads on the underside of the unmachined covers at his own expense, which, if done, will render them noiseless and remove the only valid objection to their use. This will make a happier solution of the difficulty from the town's standpoint than would an award of merely nominal damages. It is found that the engineer did accept the covers and seats with the understanding outlined. The issues on this claim are found for the defendant.

Two special defenses remain to be disposed of, viz., the third and fifth (which latter is the defendant's surety company sixth defense). Both of these raise questions which in view of the conclusions reached *supra* are academic only. The third special defense recites the matter pleaded in the second, which latter alleges an acceptance of the work done under both contracts about November 23, 1937, and the fifth special defense (defendant's surety company sixth defense), incorporates the allegations of the fourth, which alleges an acceptance of the work done under both contracts at or about June 8, 1938. Both the third and fifth special defenses then conclude with an allegation that the alleged defective construction of the sewers covered by Contract B-1 did not appear "within the period of limitation provided in section 29 of Contract B-1, nor did the alleged defective construction covered by Contract B-2 appear within the period limited in section 51 of Contract B-2."

The defenses so pleaded, it therefore appears, stress the alleged *acceptance* of the work done under the contracts as the event from which the time during which liability for defective materials or work is to be measured under the respective provisions of the contracts referred to. But, it is the date when such defects appear following *substantial completion* under Contract B-1 and under Contract B-2 that when *final estimate* is made and signed—and not the date of *acceptance* under either of them—which marks the beginning of the period limited in paragraph 29 of Contract B-1 and the commencement of the period during which the guarantee described in paragraph 51 of Contract B-2 shall be in effect. In so far, therefore, as the third and fifth special defenses allege (the surety company's sixth), otherwise, both are insufficient.

By isolating the last paragraph of each, however, from the rest of the matter contained in these defenses and considering their contents, respectively, as in itself an allegation of a distinct defense, its phrasing is sufficiently general to raise the question whether the conditions produced by the alleged breaches described in the complaint "appeared" within the period limited in paragraph 29 of Contract B-1 and that of the guarantee in paragraph 51 of Contract B-2. For the purposes of the record the following conclusions are reached as concerns these questions.

It is found that the work done in performance of Contract

B-1 was substantially completed in June, 1939, and the final estimate under Contract B-2 was prepared in late August, 1938, but was not filed with the state director of the Public Works Administration until November 11, 1938. As respects the claim based upon the allegation that some of the manhole seats and covers were defective, this was first discovered some time in June, 1937. Since the condition has not been remedied it is certain that it appeared within the time limited in the particular provision of each of the contracts; the infiltration complained of did not appear within the meaning of the applicable provision of Contract B-1 until more than a year following the date of substantial completion but within the period limited for the operation of the guarantee in so far as the work done under Contract B-2 is concerned. As respects the claim for breach of contract relating to the backfill, the condition complained of did not appear until soon following the hurricane of September 21, 1938, which was after the period limited in Contract B-1 but as to which the town is entitled to the benefit of the guarantee contained in Contract B-2. It follows that these defenses prevail against the claim for damages for excessive infiltration of the sewers constructed under Contract B-1 and likewise as respects the claim for damages by reason of contended improper backfilling under Contract B-1 but are otherwise ineffective.

Defendant London & Lancashire Indemnity Company has filed a special defense (viz., "Fourth Defense") in which it alleges that the town did not give notice to it of the alleged defective construction of the sewers by the contractor until October 13, 1938; that this was beyond the period of one year from June 26, 1937, respecting Contract B-1 and not within the period of six months from June 29, 1937, respecting Contract B-2 under the provisions of section 1:21 and 1:34 of the respective specifications and was such a breach of "said contracts" as discharged the defendant from liability arising out of the causes of action alleged in the complaint.

The provisions of the contracts referred to do not purport to limit the time during which an action must be commenced to enforce liability in accordance with them. They are concerned only with rights of action—not with the enforcement of them.

Likewise, the alleged failure of the town to give the defendant "reasonable notice" of the alleged defective construc-

tion of the sewers, thereby depriving the defendant of a reasonable opportunity to effect any repairs if necessary at a less expense than could be made after October 13, 1938, is equally without legal merit, as well as evidence to support it.

The issues formed by this defense and the town's pleadings addressed thereto are found for the town. In this connection, see, Bridgeport vs. Aetna Indemnity Co., 91 Conn. 197; Joy Co., Inc. vs. New Amsterdam Casualty Co., 98 id. 794; New Haven vs. Eastern Paving Brick Co., 78 id. 689; 28 C.J., Guaranty §139. Compare Yaffe vs. Glens Falls Indemnity Co., 115 Conn. 375.

It is alleged in the first counterclaim that the town since June 8, 1938, has owed the contractor a balance due the contractor on account of the work performed under both contracts, of $2,722.80. Against this the town claims "offsets" for certain repairs made under its direction to which it is found entitled, as follows:

| | |
|---|---|
| Repairing lateral at 99 River Street, in which two lengths were pitched the wrong way | $ 40.37 |
| Repairing lateral at 87 River Street, pitched the wrong way for its entire length | 256.42 |
| Completing lateral at 61 River Street, which did not extend to curb line | 39.60 |
| Repairing private drain crossing sewer drainage at 64 West River Street, which was not replaced | 40.00 |
| | $376.39 |

The issues on this counterclaim are found for the contractor and that there is due him a balance of $2,346.41 with interest since June 8, 1938 to July 22, 1940, or a total of $2,645.17.

The second counterclaim alleges in reality two breaches of each contract by the town, the first of which it is asserted arose out of the following facts: Under each of the contracts the contractor was required to lay cast iron pipes across the Wepawaug River, those to be constructed under Contract B-1 at a point above what is known as the lower dam and those under Contract B-2 at a point below such dam and further south. The dam in question is equipped with a gate which, when open, drains the river water north of it and deflects the flow from the river bed to the east and below the lower crossing site. Sections 1:20 of the specifications under

Contract B-1 and 1:27 of those under Contract B-2 state that the contractor in performing the work "may operate" the gate in question. The purpose of this, of course, was to enable the contractor to construct and lay the pipe lines in question under comparatively dry conditions, more speedily and with less expense than would be the case otherwise.

It is alleged, and apparently undisputed, that the contractor was ready and planned to make both of these river crossings in June, 1937, and at that time applied for and was given the sanction of the resident engineer to proceed with that, which was one of the most difficult and important parts of the project. Accordingly, the contractor's president applied to the first selectman for the key which unlocked the gate but was refused and informed by the latter that he could not have it until the end of the summer season. In its answer to this counterclaim the plaintiff alleges that considerations of public health dictated this course upon the part of the first selectman and on the evidence it is claimed that the drainage of the river into which some 40 private sewers expelled their contents above the dam would leave excreta, and other polluting substances exposed to the hot sun of June, July and August, thus producing conditions which would be likely to menace the health of the community. A second consideration which may also have at least contributed to the action of the first selectman has to do with avoiding a condition which might prove distasteful to the large number of tourists and summer residents who inhabit the beaches of Milford during the summer season and who have occasion to frequent the section to patronize motion picture theatres and places of business located there. Of the two reasons it is probable that the latter proved the more persuasive but there is some evidence to support the former and as this has the weightier considerations behind it the conclusion with respect to it will be decisive of the validity of both.

In *Keefe vs. Union,* 76 Conn. 160, the history of legislation to the date of the opinion at the end of 1903 respecting public health officers and boards is traced. It appears therefrom that the duty with its accompanying authority "to take all proper steps to prevent the spread of contagious diseases" was originally (*i.e.* in 1711) imposed upon the selectmen of each town; that later such powers were vested in a board of health in each town which was constituted of the selectmen

and which performed its duties in that capacity directly, but in 1866 was authorized to appoint such health officers and committees as might be deemed expedient and to delegate to them the powers possessed by such board. Still later, viz., in 1875, the town boards of health were constituted of the justices of the peace resident there in addition to the selectmen. Finally in 1893, all town boards of health were abolished and it was ordained that the judges of the Superior Court residing in each county appoint a health·officer for such county who, in turn, should appoint a person "learned in medical and sanitary science" in each town who should exercise in such town "all the powers and duties by law vested in and imposed upon town boards of health, or health officers or committees."

Though the power to appoint town health officers presently resides in the boards of selectmen of each of the towns except as may be provided otherwise in any special act (Supp. [1939] §865e), in 1936 such officials were named by the county health officers appointed by the judges of the Superior Court (Gen. Stat. [1930] §§2402, 2403). Among the prescribed duties of town health officers were and are, that of examining "into all nuisances and sources of filth injurious to the public health, [and] to cause such nuisances to be abated." Also: "In each town....the town health officer shall have and exercise *all* the power for preserving the public health and preventing the spread of diseases" (Gen. Stat. [1930] §2407) inclusive of that of enforcing "the laws, rules and regulations relating to public health" as affected by the condition of any stream or body of water to which the town is contiguous even though the same be not within it (Gen. Stat. [1930] §2409).

It is thus clear that the first selectmen of towns have never possessed any power or authority concerning matters affecting the public health; the board of selectmen of the several towns were divested of all that had been previously reposed in them in 1903 and have remained so since that time. It follows, of course, that the town health officer was the sole official vested with authority to determine whether the draining of the river at the point in question would be likely to injuriously affect the public health. In him was vested *all* the power to act in the premises and in the first selectman, none. When, therefore, the first selectman refused to permit the contractor to

open the gate and lower the river he acted without any legal authority or warrant. However real or fanciful the alleged danger to the public health might actually have been, his act constituted an interference with and hindrance to the contractor in the performance of his contract obligations, unjustified by any sanction of legal right or power. The fact that the first selectman might have believed in good faith that the conditions which would ensue upon the lowering of the river waters would be likely to produce and disseminate disease does not derogate from this conclusion; nor does the circumstance that the plaintiff in an endeavor to excuse the conduct has produced evidence which has a tendency to support such a view. The decision was one to be made by the town health officer on his own judgment exercised upon a consideration of his personal knowledge of the situation and its probable consequences. Incidentally, it may be noted that the first selectman does not affect to justify his conduct at the time he withheld the key to the gate from the contractor as then based upon the advice or suggestion of anyone having expert knowledge of whether or not the drainage of the river would be likely to prove a dangerous hazard to the public health.

The duty was on the board of sewer commissioners primarily and on the town ultimately to furnish the contractor with the means of opening the gate within a reasonable time after it made known that it was ready to lay the pipes across the river so as not "to prevent or impede due progress of the work." *Tompkins, Inc. vs. Bridgeport,* 100 Conn. 147, 161. The fact that the town health officer in a proper exercise of his authority might have prevented the draining of the river at the time the first selectman refused to deliver the key is beside the point. He took no such action. All "contracts must be understood as made in reference to the possible exercise of the rightful authority of the government." *Huntington Telephone Co. vs. Public Utilities Commission,* 118 Conn. 71, 79. Those involved here were no exception to that rule. But the mere existence of that potentiality furnished no excuse to the parties to refuse or refrain from the performance of their obligations under the contracts while the governmental power remained unexerted. The conclusion seems compelled that in the failure to deliver the key to the gate at the Wepawaug River in June, 1936, when the contractor was prepared to proceed with the crossing there, the town breached both of the contracts. Restatement, Contracts §§312, 315. *See, also,.*

*Bridgeport vs. U.S.F. & G. Co.,* 105 Conn. 11. Whether this breach was of such a vital character as would have justified the contractor in renouncing the contracts and abandoning the work at this point is a question which need not be considered, since in any event it waived such breach when it proceeded with the work when the first selectman finally permitted it to open the gate immediately following Labor Day, 1937. Restatement, Contracts §317; Southerland, Damages (4th ed., 1916), Vol. 3, §714; *Southern Bitulithic Co. vs. Hughston,* 177 Ala. 559, 569.

While among some of the cases there appears to be some dissent from the proposition, nevertheless the great weight of authority is to the effect that where an owner breaches a contract by hindering or delaying its performance on the part of the contractor and the contractor later resumes and completes the performance of the contract, he thereby waives the breach but is nevertheless entitled to be compensated for any damage which he has sustained by reason of such breach. 9 C.J. Building and Construction Contracts §135; Id. §73; 17 C.J.S. Contracts §493; *Stubbings Co. vs. World's Columbian Exposition Co.,* 110 Ill. App. 210, 221; *Tobey vs. Price,* 75 Ill. 645; *Weeks vs. Rector, etc., of Trinity Church,* 56 App. Div. 195, 200, 67 N.Y.S. 670. This claim is not one for "extras" and, therefore subject, as in the usual case as respects its allowance, to the provisions of the contract as to the time of its presentation and approval by the engineer or architect or submission to arbitration or the necessity of being presented before or at the time of the final payment. *Dobbling vs. York Springs Ry. Co.,* 203 Pa. 628, 53 Atl. 493, 494; *Stubbings Co. vs. World's Columbian Exposition Co., supra,* 221; *City of Elgin vs. Joslyn,* 136 Ill. 525; *C. & E. I. R.R. Co. vs. Moran,* 85 Ill. App. 543, affd. 187 Ill. 316, 324; *Weeks vs. Rector, etc., of Trinity Church, supra.*

In consequence, the provisions of paragraph 50 of Contract B-1 and paragraph 14 of Contract B-2 which stipulate that by the acceptance of the final payment the contractor releases the town from "all claims and liability to the Contractor for all things done or furnished in connection with this work and from every act and neglect of the owner and others relating to and arising out of this work"....do not apply. On the facts outlined the contractor is, therefore, entitled to be compensated for any damage or loss to which he has been subjected

by reason of the interruption, hindrance, interference or delay caused by the town in connection with its performance of that part of the contract which required it to construct and lay pipes under both of them at the points named across the Wepawaug River. The amount of damages which a party to a contract may generally be awarded upon its breach by the other, is such as flow directly from such breach or lie within the realm óf its reasonably probable consequences or, as it is said, such as the parties when they make their agreement must have contemplated would ensue from a breach of the particular character which occurred. If, however, there are special circumstances attending the business which is the subject matter of the contract or with which it is concerned, the damages resulting from a breach which the parties would reasonably contemplate would be such as would ordinarily follow from a breach of the contract under such special circumstances. *Cohn vs. Norton,* 57 Conn. 480, 491; *and see, Bridgeport vs. Aetna Indemnity Co.,* 91 id. 197, 204, 205; *Maguire vs. Kiesel,* 86 id. 453, 461; *Comstock vs. Connecticut Ry. & Lt. Co.,* 77 id. 65; *Bernhard vs. Curtis,* 75 id. 476.

Examination of the claim made by the contractor in this respect as it is outlined in the counterclaim and as appears from the evidence produced in support of it comes to this: that had the contractor been permitted to have started the work of crossing the river in June, 1937, and to have continued it uninterruptedly it would have had the advantage in so doing of comparatively favorable weather and river conditions in that the rainfall in June, 1937, was relatively light and infrequent, so that the effect of this upon the trenches and upon the flow in the channel of the river due both directly to precipitation and to the confluence of water from the area drained by it would have afforded a minimum of interference or difficulty in the conduct of the work; but in September when it was permitted to resume the work the rainfalls were heavy and continued so during October and November; likewise the tides which affected the lower crossing were higher and the water more turbulent so that as a result the work was done under great difficulties, was frequently interrupted and finally had to be stopped some time in November. As a consequence of this it is alleged that the cost to the contractor of the performance of the construction program was greatly increased over what it otherwise would have been. The claim, therefore, is based in reality upon the effect of the elements in the

season when the work was required to be done in comparison with those which prevailed at the time the contractor wished to and was prepared to do it, and the question is, are losses sustained for such reason such as may be said to be the direct or reasonably probable consequence of the breach of, or within the contemplation of the parties at the time they executed the contract? It is manifest that the contention depends for its validity upon the proposition that precipitation and other weather conditions in June, July and August would be more favorable than in September, October and November, and that the parties must have contemplated this when the contracts were executed. Aside from temperatures (which are not included in the formula) this presupposes that there is some fixity or, at least, probability of rain and weather conditions characteristic of June, July and August differeent from those which obtain in September, October and November, and that when the contracts were executed the parties contracted with these facts in mind. The contracts themselves are not only silent upon that feature but give no hint that such ideas had any place in the engagements of either of the parties. Quite the contrary, it is stipulated that the sequence of the work should be as directed by the resident engineer so that if engineering considerations required that the river crossing be made in the fall or spring, the contractor bound himself to do it at that time. Moreover, the premise that there is any certainty, or even probability, that there would be less precipitation, storms or natural drainage to swell the channel of the river in the summer months in contrast to the autumn period hardly takes account of the tempermentalities of climatic conditions in this section of New England which are more famous for their unpredictability than consistency. In addition, the evidence indicates that the maximum of interference with the work of crossing the river was not necessarily dependent upon the comparatively heavy total rainfall of one season as compared with the other. If it could be assumed that there is such a normal increase in precipitation in the fall and spring in comparison with the summer months as would afford reasonable basis for reliance upon such a cycle being maintained with some degree of uniformity, that would not of necessity be decisive. For it is apparent that the purely opportunistic occurrence of rains could have been quite as disastrous to the contractor even though it occurred in a season presenting minimum precipitation ordinarily, as might be the case in a month

or at a time when the heaviest total rainfall might be expected. And this could have happened during the summer as well as at any other time of the year.

Notwithstanding, the difficulty of applying the rule in the situation presented here is manifest, for it is obvious that there is ample area for difference of view and corresponding divergence of conclusion. However, the authorities more nearly in point dispute the contractor's contentions. A fairly analogous factual situation was presented in *Western Union R.R. Co. vs. Smith*, 75 Ill. 496. It there appeared that the plaintiff had contracted with defendant to construct earth-work and do grading on a railroad line, the work to be completed before the ground froze; he was prevented from fully performing his contract within the stipulated time because of defendant's delay in furnishing certain materials under such circumstances as constituted such a breach on defendant's part as would have justified him in abandoning the work; however, when the materials were later furnished he continued to perform and completed the work after the ground had become frozen. He then made claim to be compensated for the additional cost of performance caused by the frozen ground but was denied a recovery. Other cases where damages consequent upon a breach were augmented by natural or other causes in which in denying a recovery it was held either that such damages were not a proximate result of the breach or were not within the contemplation of the parties when the contract was made. *Marsh & Co. vs. Light and Power Co.*, 196 Iowa 926, 195 N.W. 754; *Daniels vs. Ballantine*, 23 Oh. St. 532; *Hayes vs. Cooley*, 13 N.D. 204, 100 N.W. 250; *Lynn vs. Seby*, 29 N.D. 420, 151 N.W. 31; *Carnegie, Phipps & Co. vs. Holt*, 99 Mich. 606, 58 N.W. 623. A very early case in Michigan appears to be *contra*, viz., *Burrell vs. New York & Saginaw Solar Salt Co.*, 14 Mich. 34, 39, but the facts are obscure and the court does not rationalize the opinion. It is the conclusion here that the additional cost of performing each of the contracts in crossing the river commencing soon after Labor Day, 1936, and in halting the work in November and resuming it in March, 1937, and then continuing until that portion of the work was completed, may not be recovered by the defendant in this action in so far as it was caused by heavier rains and waters in the channel and river bed and as respects Contract B-2 by reason of such conditions and of tidewater and the turbulent condition of same from time to time

because such extra expense is not under the allegations of the second counterclaim and in view of the evidence a natural result of the breach of contract involved nor a special circumstance within the contemplation of both of the parties at the time the contracts were executed. The contractor is, however, entitled to nominal damages for the breach which are fixed at $30.

The other cause of action described in the second counterclaim alleges in substance that because of the order of the resident engineer who in issuing it was carrying out the directions of the board of sewer commissioners, he was compelled to construct a section of the sewer lines "backward." It seems that the proper and most advantageous way to proceed was to commence the construction at a low and work toward the higher elevations because in that way water encountered in the trenches moves by gravity to the lower point and so ordinarily it would not be necessary to pump it out of the trench.

The advantageous place to start the work under Contract B-2 was on Seaside Avenue and Lafayette Street, which is a low point in the system and near the pumping station. The contractor, in June, 1936, wished to commence there, but the resident engineer would not permit him to do so because the board of sewer commissioners objected for the reasons that the highways in question furnish the principal and most convenient way of travelling to and from the beaches and excavations there would interfere with tourists and summer residents. The contractor was compelled, therefore, to work at other points and in such a manner that about 375 feet of sewer line was laid on Noble Avenue against a descending, instead of an ascending, grade. While the drop in this distance was only about six inches, the fact that its direction as respects the grade was reversed produced great difficulties in getting rid of the large quantities of trench waters encountered there. To accomplish this the walls of the trench had to be sheathed; a reverse drain and sump provided and four pumps manned and operated continuously day and night. In these and other respects the contractor was subjected to expenses totalling the alleged sum of $14,590, which would not have been incurred if it had been permitted to excavate the trench and build the line in the usual way. Likewise, the manner of joining the pipe sections was the opposite of that normally employed.

The town, in addition to a general denial, pleads that the contractor "agreed" to the course described and waived any right to be compensated for any detriment suffered because of it. There is no evidence from which it could be permissibly found that the contractor consented to the order in question in the sense of yielding up any claim for damage or otherwise by reason of his compliance with it; quite the contrary, he protested vigorously and consistently. This disposes of any defense of express waiver. Whether or not an implied waiver arose from the circumstance that it acquiesced in the final estimate and accepted the final payment is another matter. But, as held *supra,* if a contractor becomes entitled to be compensated for loss sustained because of a breach of a contract by an owner, thereafter waived by continuing to perform, the fact that he fails to make claim for such damages before he receives final payment is not a waiver of his right to recover. *Dobbling vs. York Springs Ry. Co.; Stubbings Co. vs. World's Columbian Exposition Co.; City of Elgin vs. Joslyn; C. & E. I. R.R. Co. vs. Moran; Weeks vs. Rector, etc., of Trinity Church,* all *supra.*

"Extra work", as employed in both contracts (B-1 paragraph, p. 10 and B-2, paragraph 1, p. 18), "....refers to and includes work required by the Owner, which in the judgment of the engineer as approved by the State Director, involves changes in or additions to that required by the Plans, Specifications and Addenda in their present form." As the subject matter of the orders of which complaint is made was not alleged and do not appear to have been concerned with changes in or additions to the work required by the drawings and specifications the increased cost of construction which arose from fulfilling them did not constitute an extra either within the intendment of the contracts or as the term is used in the law. Whether or not they constituted breaches of the contracts involves another paragraph which appears in both (paragraph 39, p. 23 in B-1 and paragraph 39, p. 31 in B-2), the germane portion of which provides: "In the performance of the work, the Contractor shall abide by all orders, directions and requirements of the Engineer and shall perform all work to the satisfaction of the Engineer and at such times and places, by such methods and in such manner and *sequence* as he shall require." The scope of authority of the engineer in ordering the sequence of the work must be determined, of course, by reference to the other provisions of the contracts.

The analysis of these agreements need not be detailed nor exhaustive, however, in so far as the question under examination is concerned. It is necessary only to observe that there is no provision in either of the contracts, and no basis upon which to erect an implication of any undertaking upon the part of the contractor, by which the performance of the work was to be accommodated to the convenience of the town, its inhabitants, summer residents, tourists or even the fire apparatus. Quite the contrary, the duty was on the town to refrain from interposing any impediment which would interfere with the contractor's orderly and expeditious progress in performing the obligations assumed by him. In this circumstance the engineer's power under the provisions quoted to determine the order and sequence of the work is confined within the limits of engineering necessities or at the most so as to conform, or, at least, not violate the mandates of accepted engineering practice. Within that sphere, provided he act reasonably and in good faith his authority was practically plenary; beyond it it was nonexistent. There is no pretense in the evidence that any consideration of engineering, expedition or benefit to the project inspired the orders to defer construction of the sewers in Seaside Avenue or Lafayette Street either in May or in June, 1937, when the contractor was ready to begin work there. The order was, hence, without sanction of any contractual provision and violative of the contractor's rights. For this the contractor is entitled to be compensated to the extent that he has established proof in accordance with legal requirements of any loss to which he was subjected as a result.

The allegations of the counterclaim as respect the so-called building of the sewer backward, as well as those which relate to the delayed crossing of the Wepawaug River as they refer to the basis upon which damages are to be determined are: "14. The difficulties encountered by the defendant in carrying out its construction program under the conditions set forth in this counter-claim greatly increased the cost to the defendant of performance thereof over what performance would have cost if the plaintiff had not unlawfully directed the defendant to alter its construction program in the manner alleged in this counter-claim." And, "16. The defendant has sustained a loss of $30,400 as a result of the defendant's breach of contract."

The evidence adduced in support of these allegations is directed to the purpose of establishing what it cost to do the work as respects labor employed, materials installed and equipment used plus a profit of 15% and deducting from the total the amount actually received under the contract, the difference being the claimed increased cost caused by the town's breach of the contract. To demonstrate the added outlays, however, the contractor has produced no books or records to establish, nor facts showing what sums were actually expended. It is apparently unable to do so because no account was kept of this as the work progressed and its ordinary method of handling such matters provides no record of how many men are employed in any particular part of a job at any time, nor at which point its various pieces of equipment are engaged or stationed. It relies wholly upon its payroll sheets, which show only the number of men and class of labor working on any particular day on a specific project.

In this situation and as a substitute for evidence which would afford specific details in these respects, testimony in the form of estimates has been introduced, designed to show what the labor and material costs were and the rental value of the equipment used. In arriving at this it is conceived that the cost of performance was increased by 30%, which is applied to the total cost of performing Contract B-2, and by that method it is claimed that the loss resulting from the breach is $9,624.74. Practically the same formula was followed in the testimony designed to establish damages consequential to the breaches of both contracts with respect to the river crossings, except that the percentage employed was $33\frac{1}{3}\%$ and the sum arrived at by applying this was allocated between labor and other elements. This process is the reverse of what it should be, for instead of the total estimate being based upon the number of men necessary to be employed at various rates of pay, etc., the amount and character and rental value of the different kinds of equipment and all the other factors required to theoretically reconstruct the work under comparable conditions, the basis of it all is an estimate expressed in percentage and the allocation to the several elements which should constitute the foundation of the estimate is based on the amount which in dollars represents such percentage.

While courts are very liberal in respect of the proof which may be accepted to establish damages, especially where the

task of demonstrating them is beset with practical difficulties, it still remains a judicial process which cannot be performed unless some reasonable basis is afforded upon which a rational conclusion, rather than a mere speculation, may predicate. Restatement, Contracts §331; *Doeltz vs. Longshore, Inc.*, 126 Conn. 597, 602; *Bushnell vs. Bushnell*, 103 id. 583, 596; *Royal Parlor Coach Co., Inc. vs. Susnitzky*, 108 id. 605; *Dean vs. Connecticut Tobacco Corp.*, 88 id. 619; *Lewis vs. Hartford Dredging Co.*, 68 id. 221. Here, the only basis upon which the estimates are made is that of long experience in the con-tracting business. While, undoubtedly that is the most im-portant element in the capacity to make such estimates, there is a complete absence of evidence of the factors which have influenced the author of the estimates in determining what percentage to apply. It is the conclusion that the contractor has failed to establish the burden of proof which rests upon it to show (1) that it is entitled to compensatory damages and (2) the amount of such compensatory damages. The judgment must, therefore, be limited to nominal damages only. These are found at $30.

The evidence shows that on January 22, 1937, the con-tractor was ordered to defer construction of sewers to be laid in Seaside Avenue. At that time it had placed pipe for use in the work along this line and in compliance with the order it removed it. Subsequently, viz., on February 5, 1937, this order was rescinded and in consequence the con-tractor was compelled to again deliver and leave pipe and other materials along the site of the proposed trench. A similar experience was had on Winthrop Court. As a re-sult of this proceeding the contractor claims that he was subjected to excessive labor costs totalling $48; the loss of use of a truck for five days, $75; and that two shovels lay idle for 30 days of a rental value of $30 per day, totalling $1,800. Undoubtedly, because of this experience, the contractor in-curred extra labor costs and was compelled to use equipment and labor in moving and removing and returning pipe and other material to the point. No reason exists in the evidence for questioning the amount of the expenditures thus incurred, viz., $48 for labor and $75 for trucking, or a total of $123. In so far as loss incurred by the shovels remaining idle is con-cerned, there is no explanation as to why this condition ob-tained for a period of 30 days. And, again, there is none from which the court may find that had it not been for the

order of deferment the contractor would have been able to have employed such shovels on some other job or at some other point on the same job. In the absence of such evidence or other, furnishing justifiable reason for charging the whole of or some particular period during which such shovels were not in use, to the town, the item for loss sustained by this idle equipment cannot be allowed. However, it is found that the contractor was subjected to a loss of $150, which is the cost of moving such shovels back and forth incident to the changes in orders and so ·is entitled to judgment on that account in the sum of $273.

In the fourth counterclaim, it is said that the contractor was subjected to loss because the town took certain work out of Contract B-2 which it had therein authorized the contractor to do and which the latter had agreed to perform. This consisted of eliminating the sewer line to be constructed on Plymouth Court, and likewise, 700 feet of house laterals to be installed at undesignated places. The former occurred as a result of a written notice to the contractor signed by the board of sewer commissioners on March 12, 1937, the latter from a direction of the engineer acting in accordance with the instructions of the board of sewer commissioners. The contract bound the contractor to do this work together with the rest of it. This imposed on the town the correlative duty of permitting the contractor to perform respecting the same and to pay him for it when he had done so, in accordance with the terms of the contract (*Markey vs. City of Milwaukee*, 76 Wis. 349, 351, 45 N.W. 28, 29, 30), or in any event to compensate him for such loss as he sustained by withdrawing it from the program. Neither can it be found from the evidence that the contractor consented or agreed to the course followed. Since it constituted a breach of the contract there was no waiver on the contractor's part in failing to present a claim for it or demanding that he be compensated until after the time when the final payment was made. As respects this item, both parties have submitted evidence of the cost of constructing and laying this sewer, inclusive of rock excavation and backfilling so that information is available from which the court may conclude the loss occasioned to the contractor. It is found that the contractor sustained a loss of profit of $2,501.50.

As concerns the item of 700 feet of house laterals which the contractor was prevented from installing, an essentially

similar situation is exhibited. It constituted work which the contractor obligated itself to perform and which, in consequence, the town impliedly bound itself to permit it to do. The town lays much stress upon the contended inability of the contractor to submit evidence from which his loss by the elimination of this work could be ascertained within the required degree of certainty. That contention arises from the fact that the drawings do not indicate and the specifications do not show on what streets such laterals were to be installed. Quite definitely, however, it is apparent that wherever they were to be designated to be placed by the engineer it would have to be on improved streets where the contractor had built sewers in accordance with his undertaking under Contract B-2 and on such as that where about the only uncertain item entering into a calculation of loss of profits would be the factor of subsoil rock excavation. But in order to determine the extent of such rock excavation it would be necessary to know where on which of the streets named in Contract B-2 the laterals are to be placed, and what the subsoil conditions existing at such location might be to the extent necessary to permit approximate estimate of rock. Since that item is completely uncertain except as it applies to pavements, it must be eliminated. That done there is no difficulty in determining and it is found that the contractor was damaged in the sum of $1,868 by reason of the town's failure to permit it to install the balance of the laterals.

The fifth counterclaim contains two bases of recovery, viz., (1) the fair value of work and labor furnished in excavating a riser allegedly broken through no fault of the contractor, and installing a new one in its place on Prospect Street, and (2) work and labor furnished in oiling and gravelling Prospect Street for its entire width when the contractor was required only to replace oiled and gravelled surfaces of highways on areas covering trench excavations. All of this work was performed pursuant to the order of the engineer. While the reasons alleged to account for the breaking of the riser are not too conclusive, on the other hand there is nothing in the evidence from which a conclusion could be justifiably drawn that it occurred as the consequence of faulty workmanship on the contractor's part. Unless it did there was no obligation on the latter to repair or pay for the cost of replacing it.

With respect to the oiling and gravelling of Prospect Street,

there is some difference of opinion as concerns the width of the trench site there because the rock was shale and when blasted "feathered out", breaking the surface of the highway irregularly to a greater width than would have been the case under other conditions. However, it is fair to assume, in view of the admitted fact that the contractor was ordered to gravel and oil that street after the trench was backfilled for the distance of its full width, that he did much more work than the specifications required of him in that respect and that his charge of $1,000 is not excessive for what he did do. This was not extra work within the meaning of that term as employed in the specifications but entirely independent of the contracts.

It is found that the contractor is entitled to recover the fair and reasonable value of both items, which, for the repair of the broken riser is determined to be $332, and for the oiling and gravelling of Prospect Street, $1,000.

In accordance with the foregoing, the issues are determined as follows: On the substituted complaint and answer thereto, for the defendants, O'Neil Bros., Inc., and The London & Lancashire Indemnity Company of America; on the issues formed by the substituted complaint and defendants' first special defenses respectively, for the plaintiff; on the issues formed by the substituted complaint and the defendant's, O'Neil Bros., Inc., second and fourth special defenses, and the defendant's, The London & Lancashire Indemnity Company of America, second and fifth special defenses, for the plaintiff; on the issues formed by the substituted complaint and defendant's O'Neil Bros., Inc., third and fifth special defenses and defendant's, The London & Lancashire Indemnity Company of America, fifth and sixth special defenses, for the defendants, except that such acceptance of the work and waiver, does not include a waiver of the provisions of paragraph 29 of Contract B-1 and paragraph 51 of Contract B-2, which it is found were not waived; on the issues formed by the substituted complaint and defendant's, The London & Lancashire Indemnity Company of America, fourth special defense, for the plaintiff.

On the counterclaims filed by defendant, O'Neil Bros., Inc., as follows: On the first counterclaim for the named defendant to recover of the plaintiff, the sum of $2,645.17; on the second counterclaim for the named defendant to re-

cover of the plaintiff, nominal damages in the sum of $60; on the third counterclaim for the named defendant to recover of the plaintiff, the sum of $273; on the fourth counterclaim, for the named defendant to recover of the plaintiff, the sum of $4,369.50; on the fifth counterclaim for the named defendant to recover of the plaintiff the sum of $1,332.

Judgment on the whole case for the defendant O'Neil Bros., Inc., to recover of the plaintiff the sum of $8,679.67. As respects the damages determined on the defendant's O'Neil Bros., Inc., third, fourth and fifth counterclaims, interest has not been included. If, however, such defendant considers that it should be, its counsel upon giving reasonable notice to counsel for the plaintiff may appear before me in my chambers at Bridgeport, at 11 o'clock a.m. (E.D.T.), on Tuesday, August 20, 1940, to present arguments respecting the matter.